**RALSTON PURINA COMPANY,**
Plaintiff,

v.

**THOMAS J. LIPTON, INC. and Lipton
Pet Foods, Inc., Defendants.**

**No. 71 Civ. 3840.**

United States District Court,
S. D. New York.

May 1, 1972.

Weil, Lee & Bergin, New York City, for plaintiff; Alfred T. Lee, New York City, of counsel.

Cravath, Swaine & Moore, New York City, for defendants; Harold R. Medina, Jr. and March Coleman, New York City, of counsel.

METZNER, District Judge:

Plaintiff Ralston Purina Company [Purina] moves pursuant to Rule 65, Fed.R.Civ.P., for a preliminary injunction restraining further use by defendant Thomas J. Lipton, Inc. [Lipton] of the name Tender Dinners as a trademark for cat food manufactured and sold by Lipton. In the alternative, Purina moves pursuant to Rule 56, Fed.R.Civ. P., for summary judgment and a permanent injunction. Jurisdiction is based on diversity of citizenship.

Plaintiff is a Missouri corporation with its principal place of business in St. Louis. For many years, among other things, it has been a major producer and marketer of prepared, prepackaged cat food of various types. Lipton is a Delaware corporation with its main offices in New Jersey. Through a subsidiary, Lipton Pet Foods, Inc., defendant manufactures and markets cat food products competitive with plaintiff's. Lipton Pet Foods is a Massachusetts corporation with its principal place of business in that state.

In 1965 Purina began development of a new type of cat food which was a cross between dry and moist. By June of 1968 the product was ready for marketing, and Purina had settled on the name Tender Vittles. The trademark "Purina Tender Vittles" was registered in the United States Patent Office on July 1, 1969, with the word "Tender" disclaimed. Package design work was completed in November 1969, and in May of 1970 initial sales were made through retail outlets in the Miami area.

The product consists of semi-moist pellets contained within four separate one and one-half ounce airtight pouches, which in turn are enclosed in an outer cardboard carton. The carton is approximately seven and one-quarter inches wide by five and three-quarters inches high by one and one-half inches deep. There are four flavors: liver, tuna, beef and gourmet dinner. The carton for each flavor has a different color combination and pictures of different cats. The name Tender Vittles appears in the upper left quadrant of the front face, with the word "Tender" printed above the word "Vittles," and the letters of each being approximately seven-eighths of an inch high. Above the name Tender Vittles and in a contrasting color appears the house mark Purina in letters approximately one-quarter of an inch high. Below the name Tender Vittles appears the phrase "Soft, moist cat food" in letters the same color as, but slightly smaller than, those used for the house mark. In the lower left corner are the words "4 delicious meals" printed above the words "4 1-1/2 OZ. foil packets." Running along the lower edge is Purina's distinctive red and white checkerboard pattern. The right half of the carton is taken up by a picture of a multi-colored cat or cats sitting behind a bowl of Tender Vittles.

Tender Vittles quickly proved a success. By July of 1970, sales were expanded to certain selected cities throughout the country, and in February 1971 distribution began on a national scale. Marketing of the product was accompanied by an advertising blitz which began in eastern markets in July 1970 and spread nationwide by April of 1971. For

the period May 1, 1970 to June 30, 1971, promotional expenditures exceeded $4,000,000 and sales totaled approximately $6,000,000. Tender Vittles had become a leader in the cat food industry and by far the biggest seller of the semi-moists.

The success of Tender Vittles can be contrasted with the totally unsuccessful efforts of three other well known producers to market a semi-moist cat food at about the same time. National Biscuit, Quaker Oats and General Foods had all met failure.

In April of 1969, Lipton began development of its own semi-moist cat food. In early 1970 it chose the name Tabby Tender Moist Total Dinners to designate the new product. Marketing began in July 1970 in the Miami area.

Lipton's product, as Purina's, consisted of semi-moist pellets in four airtight pouches packaged in an outer cardboard carton. However, the carton for Tabby Tender Moist Total Dinners presented an appearance totally different from that of Tender Vittles. Apart from differences in name, lettering and layout, the shape of the Lipton carton was small and squat as compared to Purina's. In addition, of the four flavors chosen by Lipton, only liver was common to both brands.

It soon became apparent that Tabby Tender Moist Total Dinners was unable to compete with Tender Vittles, and by September of 1970 Lipton decided that several changes had to be made. The result was that the size and general appearance of the outer carton was wholly revamped, the retail price was reduced, the composition of the semi-moist pellets was altered, and the name was changed to Tender Dinners.

As the product is presently marketed, its retail price corresponds to that for Tender Vittles and its outer carton is identical in size and shape to the carton of the Purina product. Unlike Tender Vittles, the color and picture on the Tender Dinners carton does not change with each flavor. Liver is still the only flavor common to both brands. All car-

tons contain the same picture of a white cat eating Tender Dinners from a clear bowl against a white background. This picture does not resemble any of the pictures on the Purina cartons. What does change with each flavor of Tender Dinners is the color of the lettering on the box.

The name Tender Dinners appears in a banner across the upper third of the carton in letters approximately three-quarters of an inch high. The letters are all lower case, as contrasted with the letters comprising Tender Vittles, which are all upper case. Directly above the word "Tender" in the upper left corner of the Lipton carton is the house mark Tabby in red letters only slightly smaller than those used for the words Tender Dinners. Below the name Tender Dinners in brown letters approximately one-quarter inch high is the phrase "soft-moist cat food." In the lower left corner in even smaller letters appears the legend "tasty meals in 4 pouches." The picture of the cat covers the right half of the carton, and some of the lettering is superimposed on the picture.

Lipton began distribution of Tender Dinners in June or July of 1971, marketing the product on a nationwide basis. Shortly thereafter Purina initiated the present lawsuit, claiming that Lipton had consciously imitated the Tender Vittles name, packaging, and promotion campaign. Purina contends that this conduct is likely to cause confusion among purchasers of cat food and constitutes trademark infringement and unfair competition.

■ Purina seeks a preliminary injunction to restrain Lipton during the pendency of this litigation from using the name Tender Dinners for its cat food. A preliminary injunction is an extraordinary remedy and will not be granted absent a clear showing by the movant of probable success at trial and possible irreparable injury if relief is denied. Societe Comptoir de L'Industrie Cotonniere Etablissements Boussac v. Alexander's Dept. Stores, 299 F.2d 33, 35 (2d Cir. 1962).

Determination of the present motion requires consideration of three questions:

(1) Is the name Tender Vittles fanciful or descriptive as applied to Purina's semi-moist cat food?

(2) If descriptive, has it acquired secondary meaning?

(3) If secondary meaning has not been acquired, is this a case in which a preliminary injunction should be granted absent secondary meaning?

■■ As to the first of these questions, a product designation is descriptive and therefore invalid as a trademark if, as understood in its normal and natural sense, it conveys to potential consumers the characteristics, functions, qualities, ingredients, properties or uses of the product. Flexitized, Inc. v. National Flexitized Corp., 335 F.2d 774, 779 (2d Cir. 1964); Stix Products, Inc. v. United Merchants & Manufacturers, Inc., 295 F.Supp. 479 (S.D.N.Y.1968); Restatement of Torts § 721. According to The Compact Edition of the Oxford English Dictionary (1971), the primary meaning of the word "tender" is: "Soft or delicate of texture or consistence; of food, easily masticated or succulent." The same dictionary defines the word "succulent" as "juicy." The word "vittles" is a corruption of "victuals" and is listed in the dictionary as an obsolete spelling. "Victuals" is defined as: "Food or provisions of any kind." Thus, the combination "tender vittles" means food which is soft, juicy and easily chewed.

This is precisely a description of Purina's semi-moist cat food. The unique characteristic of this product and the quality which sets it apart from other non-canned cat foods is that it is soft and juicy. This is just what is conveyed by the words "tender vittles."

■■ Even though a product name be descriptive, it may be protected as a trademark if it has acquired secondary meaning. W. E. Bassett Co. v. Revlon, Inc., 435 F.2d 656 (2d Cir. 1970); 1 Nims, Unfair Competition and Trade-Marks § 36 (1947); Restatement of

Torts § 716(b). A term which is descriptive and therefore part of the public domain may, through usage by one producer with reference to his product, acquire a special significance so that to the consuming public the word has come to mean that the product is produced by that particular manufacturer. 1 Nims, *supra* at § 37. This is what is known as secondary meaning.

■■ The crux of the secondary meaning doctrine is that the mark comes to identify not only the goods but the source of those goods. To establish secondary meaning, it must be shown that the *primary* significance of the term in the minds of the consuming public is not the product but the producer. Kellogg Co. v. National Biscuit Co., 305 U.S. 111, 118, 59 S.Ct. 109, 83 L.Ed. 73 (1938); 2 Nims, *supra* at § 334. This may be an anonymous producer, since consumers often buy goods without knowing the personal identity or actual name of the manufacturer. Tas-T-Nut Co. v. Variety Nut & Date Co., 245 F.2d 3, 7 (6th Cir. 1957); Douglas Laboratories Corp. v. Copper Tan, Inc., 108 F. Supp. 837, 841 (S.D.N.Y.1952), aff'd, 210 F.2d 453 (2d Cir. 1954); 1 Nims, *supra* at § 42. However, it must be demonstrated that the purchasing public associates goods designated by the particular word or words in question with but a single, though anonymous, source. In other words, the consumer, having acquired confidence in the quality of a particular product through usage, is entitled to protection against imitations marketed by other producers.

■ Proof of secondary meaning is often difficult. No precise guidelines are applicable and no single factor is determinative. Each case must be decided on its own facts, considering such elements as length and exclusivity of use, sales levels, extent of advertising and promotion, etc. Compare Kellogg Co. v. National Biscuit Co., *supra* [no secondary meaning even though plaintiff originated term "shredded wheat," used it exclusively for over 30 years, and spent over $17 million in advertising], with

Noma Lites, Inc. v. Lawn Spray, Inc., 222 F.2d 716 (2d Cir. 1955) [secondary meaning possible after a matter of months due to highly seasonal nature of plaintiff's business], and Fund of Funds, Ltd. v. First American Fund of Funds, 274 F.Supp. 517 (S.D.N.Y.1967) [secondary meaning acquired after three years due to plaintiff's rapid success and extensive publicity].

■ Proof of secondary meaning entails rigorous evidentiary requirements. The term in question must have been "used in such a manner, over such a period of time, and to such an extent that the purchasing public associates" it with the goods of a particular source. Automatic Washer Co. v. Easy Washing Machine Corp., 98 F.Supp. 445, 450 (N.D. N.Y.1951).

■ In considering the issue of secondary meaning in this case, it is important to keep in mind the market in which Purina's product was sold. At the time in question the semi-moist cat food market was very young and in a state of flux. The life of the various semi-moist brands proved quite brief, and the public was assaulted with a number of new products within a relatively short period of time. One brand would spring up and die, only to be replaced by another, which could be manufactured by the same producer as the old. Tender Vittles and Tender Dinners were but two brands in this market. Although Tender Vittles came first, it had been distributed for only a year when Tender Dinners first appeared. In a market so new and unsettled, it is doubtful that the name of any product could have acquired secondary meaning in so short a time.

■ The fact that Tender Vittles became the biggest seller of the semi-moists means nothing more than that it became the most popular. However, popularity and sales alone cannot establish secondary meaning. Norwich Pharmacal Co. v. Sterling Drug, Inc., 271 F. 2d 569, 572 (2d Cir. 1959), cert. denied, 362 U.S. 919, 80 S.Ct. 671, 4 L.Ed.2d 739 (1960); Remco Industries, Inc. v. Toyo-menka, Inc., 286 F.Supp. 948, 953 (S.D. N.Y.), aff'd per curiam, 397 F.2d 977 (2d Cir. 1968). Similarly, the fact that Purina spent $4,000,000 promoting its product merely indicates its efforts to establish secondary meaning, but does not determine the success of those efforts. Remco Industries, Inc. v. Toyomenka, Inc., *supra* at 953.

The evidence offered by Purina other than sales and advertising levels is equally inconclusive. Surveys showing levels of brand awareness for cat food products among consumers demonstrate only that consumers have knowledge of brand names. The surveys do not reflect any evaluation of the products which could form a basis for the acquisition of a secondary meaning.

In another survey, consumers were given discount coupons bearing the name Tender Vittles. The survey showed that in redeeming the coupons approximately 35 of 175 persons exhibited greater or lesser confusion between Tender Vittles and Tender Dinners. This amounts to nothing more than that the customer could not read or did not really care. There is no showing that the customers wanted to purchase Tender Vittles because of past experience with it, and purchased Tender Dinners because of confusion in name and packaging. Tradesmen, in addition to customers, are sources of proof in this area.

Having carefully reviewed all the relevant evidence presented by the parties, the court is of the opinion that Purina has failed to demonstrate a clear probability of proving secondary meaning at trial. Purina cites W. E. Bassett Co. v. Revlon, Inc., *supra,* for the proposition that its burden is merely to show that Tender Vittles more likely than not has acquired secondary meaning. This is another way of stating the preponderance of evidence rule applicable in all civil cases. However, the *Bassett* decision dealt with a plaintiff's burden at trial, not on a motion for preliminary injunction, where the plaintiff must meet the somewhat higher

burden of a clear showing of probable success.

Of course, the fact that Purina has failed to make a sufficient showing of secondary meaning at this stage of the litigation to justify a preliminary injunction does not preclude it from proving secondary meaning on the full trial. Certainly sales levels and advertising expenditures for Tender Vittles have been substantial, and the product's success in a relatively short period of time has been extraordinary. Because of differences in burden of proof and the opportunity to present additional evidence, Purina may succeed later where it has failed now.

■ This leaves for consideration the question of whether this is a case in which a preliminary injunction should be granted absent secondary meaning. Both New York and federal law allow injunctions to issue without proof of secondary meaning in certain limited situations. Norwich Pharmacal Co. v. Sterling Drug, Inc., *supra.* These involve cases in which the defendant has engaged in various predatory practices such as abuse of confidential business secrets (Noma Lites, Inc. v. Lawn Spray, Inc., *supra*), breach of fiduciary duty (Flexitized, Inc. v. National Flexitized Corp., *supra*), or palming off its product as that of plaintiff (Santa's Workshop, Inc. v. Sterling, 2 A.D.2d 262, 153 N.Y.S.2d 839 (1956)).

■ In the present case the question comes down to whether Lipton has been attempting to palm off its semimoist cat food as Purina's. The court is of the opinion that Purina has failed to present sufficient evidence to justify preliminary relief at this stage of the litigation.

■ Palming off is an attempt by one person to induce consumers to believe that his product is actually that of another; it requires an intent to deceive and proof of actual fraud. Venetianaire Corp. of America v. A & P Import Co., 302 F.Supp. 156, 160 (S.D.

N.Y.1969), aff'd, 429 F.2d 1079 (2d Cir. 1970); Remco Industries, Inc. v. Toyomenka, Inc., *supra* 286 F.Supp. at 954; Restatement of Torts § 717, Comment *a* at pp. 565–66. The mere fact that two products have similarities as to name and packaging does not necessarily establish palming off. Remco Industries, Inc. v. Toyomenka, Inc., *supra* at 955; Pocket Books, Inc. v. Meyers, 292 N.Y. 58, 54 N.E.2d 6 (1944). Absent secondary meaning, no manufacturer can acquire a proprietary right in the physical construction or coloring of the carton used for its product. Tas-T-Nut Co. v. Variety Nut & Date Co., *supra* 245 F.2d at 5–6. Simulation, of course, may be so extensive as to allow an inference of intent to deceive. 2 Nims, *supra* at § 335. However, so long as the defendant has taken reasonable precautions to distinguish its product from that of plaintiff, a finding of palming off will not be justified. Kellogg Co. v. National Biscuit Co., *supra;* Tas-T-Nut Co. v. Variety Nut & Date Co., *supra* 245 F.2d at 5–6.

Although the names of the two products here are identical as to their first word, they differ as to the second. Both words must be considered of equal dignity; a consumer would not attempt to buy one of these cat foods merely by using the word "tender." In such a situation the likelihood of deception must be considered reduced. See J. R. Wood & Sons, Inc. v. Reese Jewelry Corp., 278 F.2d 157 (2d Cir. 1960); Air Products, Inc. v. Marquette Manufacturing Co., 301 F.2d 348, 49 CCPA 973 (1962); Dell Publishing Co. v. Stanley Publications, Inc., 9 N.Y.2d 126, 211 N.Y.S.2d 393 (1961). In addition, there are differences in packaging which are detailed above.

■ Most significant is the emphasis given the house name Tabby on Lipton's carton. It is displayed conspicuously above the word "Tender," in red letters only slightly smaller than those used for the product name. Use of

a house name will generally not excuse infringement of a valid trademark. Menendez v. Holt, 128 U.S. 514, 521, 9 S.Ct. 143, 32 L.Ed. 526 (1888); W. E. Bassett & Co. v. Revlon, Inc., *supra*, 435 F.2d at 662; Tas-T-Nut Co. v. Variety Nut & Date Co., *supra* 245 F.2d at 7. However, in such cases intent to deceive is not an element. 2 Nims, *supra* at §§ 348–351. Where such intent is at issue, it is doubtful that one who displays his house mark prominently on the front of his product is attempting to palm that product off as another's. Kellogg Co. v. National Biscuit Co., *supra;* Dell Publishing Co. v. Stanley Publications, Inc., *supra.* Any consumer who is looking for Purina's product need only glance at the face of Tender Dinners to see that he has the wrong thing.

Here again the court must emphasize that the fact that Purina has failed to make a showing of intent to deceive sufficient to justify a preliminary injunction does not preclude it from establishing such intent on the full trial.

Ultimately, the present case comes down to balancing the need to ensure a competitive marketplace against the necessity to protect the consuming public from confusion or deception. See Norwich Pharmacal Co. v. Sterling Drug, Inc., *supra.* Compromise is often required, and decision in any given case depends on where the line is drawn. Although there certainly is a difference between "a deliberate attempt to deceive and a deliberate attempt to compete", (Norwich Pharmacal Co. v. Sterling Drug, Inc., *supra*, 271 F.2d at 572), the line is often fuzzy and not easily deciphered. While, as already indicated, plaintiff may ultimately be successful in this lawsuit, the nature of the proof submitted here, when weighed against the burden on the court to draw the proper line, requires the denial of Purina's motion for a preliminary injunction and for summary judgment.

So ordered.