**SARATOGA VICHY SPRING CO., INC., Plaintiff,**

**v.**

**Orin LEHMAN, Commissioner of Parks and Recreation of the State of New York and Waters of Saratoga Springs, Inc., Defendants.**

**No. 79–CV–151.**

United States District Court, N. D. New York.

Aug. 24, 1979.

Whiteman, Osterman & Hanna, Albany, N. Y., Singer, Hutner, Levine & Seeman, New York City, for plaintiff; Michael Whiteman, Howard E. Chase, Robert J. Kaplan, Eli R. Mattioli, New York City, of counsel.

Robert Abrams, Atty. Gen., State of N. Y., Albany, N. Y., for defendant Lehman; Lawrence J. Logan, Asst. Atty. Gen., Albany, N. Y., of counsel.

Howard & Holland, New York City, for defendant Waters of Saratoga Springs, Inc.; Albert Holland, New York City, of counsel.

JAMES T. FOLEY, District Judge.

## MEMORANDUM–DECISION AND ORDER

Plaintiff, the Saratoga Vichy Spring Company, Inc., has commenced this action for declaratory and injunctive relief against the defendants, Orin Lehman, as Commissioner of Parks and Recreation of the State of New York, hereinafter sometimes referred to as the state defendant, and, Waters of Saratoga Springs, Inc., a licensee of the state defendant, hereinafter defendant licensee. This action arises under 15 U.S.C. §§ 1051 *et seq.* (Lanham Act) and 28 U.S.C. § 2201 (Declaratory Judgment Act). The jurisdictional predicates for plaintiff's several claims are 28 U.S.C. § 1338(a) and (b), and, 15 U.S.C. § 1121. It has recently been brought to the court's attention that plaintiff has changed its name to the Saratoga Springs Co., Inc., subsequent to the commencement of this action.

Plaintiff's complaint sets forth four claims for relief. The first and second claims arise under the Lanham Act—15 U.S.C. §§ 1114 (infringement) and 1125(a) (false designation of origin and description), respectively. Plaintiff's third claim is one for unfair competition. 28 U.S.C. § 1338(b); *see Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 540–41 (2d Cir. 1956). Plaintiff's fourth claim is premised upon New York's trademark infringement and "anti-dilution" statutes. N.Y.Gen.Bus. Law §§ 368–b and 368–d. *See generally, United Mineworkers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

Briefly, the gravamen of complaint is that the state defendant's New York registered trademark, "Saratoga Geyser", which appeared upon the labels of its bottled mineral water, infringes upon plaintiff's earlier and exclusive use of its U.S. Patent Office registered trademarks, "Saratoga Vichy", the logo formed by combining the letters "S" and "V", and a combination of these two marks, which similarly appeared upon the label of its carbonated mineral water— Saratoga Vichy.

The factual posture of this litigation is far more complex than this brief description; therefore, further explication is necessary.

At the outset, it is noted that the plaintiff is no stranger to trademark litigation involving its mineral waters. *See La Republique Francaise v. Saratoga Vichy Spring Co.,* 107 F. 459 (2d Cir. 1901), *aff'd,*

191 U.S. 427, 24 S.Ct. 145, 48 L.Ed. 247 (1903); *Saratoga Vichy Spring Co. v. Saratoga Carlsbad Corp.*, 45 F.Supp. 260 (S.D.N.Y.1942). Other mineral springs unique to Saratoga Springs have generated litigation wherein protection was sought for the goodwill associated with the peculiar curative properties said to be found in their mineral waters. *Congress Spring Co. v. High Rock Congress Spring Company*, 45 N.Y. 291 (1871).

Saratoga Springs, lying in the foothills of the Adirondack Mountains in upstate New York, has long been known for its abundant mineral springs. The source of these waters is the underground Orenda River which pushes its way to the surface in numerous locations within the present Saratoga State Spa Park. The Iroquois are said to have described the waters as the "Medicine Springs of the Great Spirit". Sir William Johnson, Superintendent of Indian Affairs in Northern America for the British Crown in a letter to Philip Schuyler in 1767 described a visit as one "to a new amazing spring, which almost effected my cure." Waller, Saratoga: Saga of an Impious Era (1966).

Saratoga Springs has drawn visitors to its waters for nearly 200 years. In the 19th century, the nation's social and financial elite would gather at the fashionable summer resort to drink the waters which were purported to contain certain medical properties as well as to attend the thoroughbred races at one of the nation's oldest and most beautiful flat tracks. To the students of thoroughbred racing the name Saratoga is established in the sport as "the Graveyard of Favorites". Most of us were not fortunate enough to experience personally the grandeur of Saratoga Springs in August during the postbellum era of the Civil War, but Edna Ferber successfully portrayed that era in her memorable novel, "Saratoga Trunk." The name Saratoga famed in our history books was derived by colonists in the area from the Iroquois word, Sarachtogue, or a similar Indian name.

In March 1872, the plaintiff's predecessor according to the record developed a well and began bottling the mineral waters. The plaintiff acquired the spring in 1876, and, since that time, has sold the water extensively under the name Saratoga Vichy Water or Natural Saratoga Vichy Water.

On March 9, 1920, plaintiff registered the mark "Saratoga Vichy" under the 1905 Trademark Act. Pursuant to the provisions of the present statute, 15 U.S.C. § 1062(c), plaintiff caused this mark to be republished on June 8, 1948. Moreover, plaintiff caused the requisite affidavits of "continued use", 15 U.S.C. § 1058, and, "incontestability", 15 U.S.C. § 1065, to be filed for this mark on July 29, 1953.

On November 14, 1939, plaintiff registered its fanciful logo under the 1905 Act; and, similarly caused this mark to be republished under the provisions of the Lanham Act. Plaintiff also filed the requisite affidavits of continued use and incontestability.

On January 24, 1967, plaintiff caused a combination of its two existing marks to be registered on the Principal Register of the Lanham Act pursuant to 15 U.S.C. § 1052(f). Concurrently, plaintiff submitted combined affidavits of continued use and incontestability.

Plaintiff has also registered these marks and others under the New York Trademark statute. N.Y.Gen.Bus. Law §§ 360 *et seq.*

These several marks have been affixed as labels upon plaintiff's bottled Vichy water and various flavored sodas continuously since 1876. Plaintiff's primary and most popular product, however, has long been its bottled mineral water, Saratoga Vichy, to which salt, bicarbonate of soda and artificial carbonation were added. Since 1968, it is alleged that sales in excess of seventeen million dollars have been realized.

Sometime in 1978, plaintiff undertook a bold marketing strategy. It discontinued production of its "celebrated Saratoga Vichy Water" and began the bottling, advertisement and commercial sales of a "natural" mineral water apparently to compete with Perrier water, the highly successful French mineral water. Plaintiff's product, unlike its predecessor, does not have addi-

tives of salt, bicarbonate of soda and "artificial" carbonation.

Finally, to complete this metamorphasis in marketing strategy, plaintiff abandoned its familiar green bottles as well as its recognized labels which embodied their distinctive marks. Seeking to reach an expanding so-called sophisticated class of consumers for whom the consumption of mineral waters is now considered chic, plaintiff's mineral water was *quite recently* revealed to the public in new "trade dress". This new trade dress, a term of the trademark field of law, consists of a clear wine-bottle-shaped glass container upon which are affixed a neck label and a body label. Plaintiff's new mineral water is boldly and simply named "Saratoga."

The neck label, completely different from the Saratoga Vichy bottle, bears a fanciful gold-colored "S" logo against a white background with the accompanying words—"Bottled Exclusively At The Source". The body label, which is oblong-shaped and affixed vertically upon the bottle contains the words printed in small red letters, "Naturally Sparkling Mineral Water", running around the vertical prominent name "Saratoga", which is set off in blue lettering imposed upon a gold background.

The body label reveals the Patent Office trademark symbol after the name "Saratoga", although there is nothing in the record before the Court which discloses whether the purported mark "Saratoga" is registered upon the Principal Register under 15 U.S.C. § 1052. It is also noted that upon close inspection of the cap, the name of the bottler is "The Saratoga Springs Co., Inc." As previously noted the plaintiff company's name was changed subsequent to the commencement of this action with the word "Vichy" dropped.

The affidavit of plaintiff's President discloses that the reason underlying this transition was more than a mere desire to achieve market penetration. Thus, it is stated that the term "Vichy" has "taken on a more general meaning, descriptive of the character of a particular type of water" as opposed to identifying waters solely with a particular region of France. The President's affidavit then underscores this observation with reference to numerous "Vichy" water products presently marketed.

While plaintiff argues that the term "Vichy" has become descriptive, it is equally plausible that the term Vichy may well have passed into the public domain. *See e. g., King-Seeley Thermos Co. v. Aladdin Industries, Inc.,* 321 F.2d 577 (2d Cir. 1963) ("Thermos"). In either case, descriptive or generic, plaintiff now asserts that "Saratoga" has become the salient feature of its trademark which tends to identify goods sold under the mark as emanating from it. *Compare* 15 U.S.C. § 1052(e)(2) with § 1052(f). It is upon this basis that plaintiff seeks to restrain the defendant licensee from using the term "Saratoga Geyser", the term Saratoga, either alone or in conjunction with other words, or any term similar thereto, in connection with the promotion or sale of carbonated mineral water or similar goods.

The role of the State of New York in the development of the mineral waters at Saratoga Springs as shown by the record submitted has been substantial. Beginning in 1909, the State began to purchase the mineral springs and surrounding lands so as to prevent private commercial exploitation and misuse of this natural resource. The total area acquired became known as the Saratoga Reservation. At that time, it was intended that the waters would be used as therapeutic aids.

Beginning in 1910, the State bottled and sold its natural mineral waters under the now-disputed "Saratoga Geyer" mark. From 1920 until 1932, the rights to bottle and sell the mineral waters were extended to private businesses under lease. In 1932, a decision was reached to convert the 2,000 acre Reservation into a health spa. To that end, the Saratoga Springs Authority was created in 1933.

A $3,200,000 bond issue was undertaken by the Authority, the proceeds of which were used to construct the Gideon Putnam Hotel, the Mineral Water Bottling Plant, the Roosevelt Baths and several other facil-

ities. Since that time, millions of dollars have been expended by the State and private contributors to create the Saratoga Spa and surrounding facilities.

Through the years, the sale and consumption of the Spa's mineral waters have always constituted an integral aspect of the facility. Beginning in 1954, the State instituted a program designed to promote the distribution of its bottled waters, not only locally, but in interstate commerce as well. In 1954, the Authority adopted its present trademark as it would appear upon labels of the bottled "Saratoga Geyser". Sales and promotion continued through the 1960's, at which time the then licensee retained a New York ad agency to promote "Saratoga Geyser". Since 1936, approximately fifty million bottles of the State's mineral waters have been sold.[1]

For some unknown reason, until now, the plaintiff, Saratoga Vichy Spring Co., has never sought to restrain the State or its licensees from using the mark "Saratoga Geyser", although their marks existed side by side for a period of sixty years.

The bottling and sales of the State's mineral waters continued through the Spring of 1971, at which time the New York State Assembly deleted funds for the operation of the bottling plant at the Spa. This decision was reached as a result of a report from the State Comptroller's Office which recommended that the State discontinue operation of the plant due to substantial annual operating losses for the years immediately preceding 1971.

Approximately eight months after the State ceased operations at the bottling plant, it caused the mark, "Saratoga Geyser", to be registered in 1972 with the New York Department of State.

Although the bottling plant ceased operation in 1971, the State in 1978 and 1979 executed various agreements with the defendant, Waters of Saratoga Springs, Inc., to lease the bottling plant, and, once again, undertake the bottling and distribution of "Saratoga Geyser" and "State Seal." To date, the defendant Waters of Saratoga Springs, Inc., has not begun to operate the State's bottling plant. At the oral argument it was stated that financing is being sought to allow the commencement of the operation.

The products of the plaintiff and the State are the same—"naturally" carbonated mineral water.[2] And, of course, their geographic origins are identical—the mineral waters unique to Saratoga Springs, New York.

At this juncture, a comparison of the various marks is warranted. The Court has previously described plaintiff's present mark; therefore, the examination now focuses upon plaintiff's predecessor and transitional marks and the defendant's mark.

Plaintiff's three registered trademarks, singularly and in combination, have appeared upon a neck band label and an oval body label which were affixed to the bottles of its various marketed beverages—especially its "Saratoga Vichy". The body label, consisting of the combined marks, was printed in black and red against a yellow background. The neck band label was printed in black upon yellow background. Its transitional label, used in 1978, employed the identical color scheme, except for the deletion of the word "Vichy" from its registered mark, "Saratoga Vichy", and, the addition of the words, "Natural Sparkling

---

1. The State, through various licensees has also bottled and marketed a non-carbonated spring water, "State Seal", as well as other mineral waters under the names General Mineral Water, Saratoga Coesa, and Saratoga Hathorn. The latter two names, along with Saratoga Geyser, are attributable to particular wells or waters in the Spa.

2. The plaintiff has seen fit to distinguish its product from the State's Saratoga Geyser, in that certain of the State's waters became the

subject of investigation concerning the presence of certain organic and inorganic materials whose levels exceed State standards for drinking water. This fact necessitates the addition of warning labels and/or disclaimers upon the bottled products. Although plaintiff denies that such a problem exists for its waters, it is admitted that plaintiff did experience declines in its sales during the period of time when these facts became known to the public.

Mineral Water", under the name Saratoga and the logo.

Plaintiff's predecessor and transitional marks bear no resemblance to its present mark, except for the presence of the name, Saratoga and accompanying legend, "Natural(ly) Sparkling Mineral Water".

The State's mark, "Saratoga Geyser", appears upon a square body label and was affixed to its bottled mineral water. This label is printed in green, gold and red against a predominantly white background. The bottom border of the label is set off against a gold background (approximately ½ inch) upon which the seal of the State of New York is imposed. This circular seal contains the words, "Bottled by the State of New York". Imprinted upon the gold border are the words "Bottled at the Saratoga Spa, Saratoga Springs, New York". The body label bears the legend, "Genuine Mineral Water" accompanied by the descriptive words, "Natural, Sparkling, Alkaline"; and, the advisory words, "Drink Anytime" and "Chill Before Serving".

The State's mark bears no resemblance to plaintiff's predecessor, transitional or present mark. Apart from the descriptive words, "Mineral Water", the sole shared characteristic of the several marks is the appearance of the name, "Saratoga". It is noted that the State's mark and plaintiff's present mark employ a fanciful, albeit distinguishing characterization for the three "A's" in Saratoga.

Finally, although the plaintiff's registered predecessor marks and the State's mark existed side by side in the market place for a period of some sixty years, plaintiff in its substantial submission has not presented to this Court one single instance of customer confusion arising out of the marketing of their respective bottled water products wherein the name "Saratoga" is a shared element for their respective marks.

## DISCUSSION

Preliminarily, the Court notes that in its consideration of the motion of the defendant Commissioner that is joined in by the licensee defendant, all of the parties have submitted statements in accordance with General Rule 10(e) of this Court, setting forth the respective contentions as to the presence or absence of genuine issues of material fact. It is firmly established in the law that there has to be no semblance of a material factual issue to warrant the grant of summary judgment.

Essentially, the defendants contend that: 1) plaintiff does not have a protectible interest in the name "Saratoga" since its distinctive registered mark is "Saratoga Vichy"; and, 2) plaintiff has acquiesced in defendant's use of the mark "Saratoga Geyser" for a period in excess of 60 years; consequently, the present litigation is barred by the doctrine of laches.

Plaintiff asserts that numerous factual issues remain for trial; however, it is clear from my review that the following purported factual issues are the ones upon which plaintiff places primary reliance to avoid entry of summary judgment: 1) whether the plaintiff's use of the name "Saratoga" has achieved "secondary meaning" in the marketplace, thereby entitling it to full protection under the provisions of the Lanham Act and the common law of unfair competition; and, 2) whether the State fraudulently acquired and/or abandoned its mark "Saratoga Geyser" as a consequence of registering the mark after ceasing bottling operations as well as ceasing the bottling and distribution of the bottled water for a period in excess of eight years.

The issues presented are complex, factually and legally, and necessitate first an examination of the general principles of trademark protection; and, thereafter, a discussion of those narrower principles deemed in my judgment applicable to this case.

▆ The function of a trademark is to identify the goods sold under the mark with a producer; however, the validity of a trademark and the degree of protection it will be accorded is determined by its "strength and distinctiveness". Generally, the strength of a mark is initially examined by reference to categories of classification:

generic, descriptive, suggestive, and, arbitrary or fanciful. The ultimate test of a mark's strength, however, rests upon "its distinctiveness, or its 'origin-indicating' quality, in the eyes of the purchasing public". *McGregor-Doniger, Inc. v. Drizzle, Inc.*, 599 F.2d 1126, 1131 (2d Cir. 1979); *Abercrombie & Fitch Co. v. Hunting World, Inc.*, 537 F.2d 4, 9–11 (2d Cir. 1976).

■ To that end, the central inquiry of the court in actions for trademark infringement "is whether there is any likelihood that an appreciable number of ordinarily prudent purchasers are likely to be misled, or indeed simply confused as to the source of the goods in question." *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir. 1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979); *Maternally Yours, Inc. v. Your Maternity Shop, supra*, 234 F.2d at 542.

■ In assessing the issue of likelihood of confusion, mistake or deception, principal consideration is given to: 1) the similarity of the marks; 2) the competitiveness of the goods; and, 3) the geographical area in which the marks are in use. Of course, this list is not intended to be exhaustive, since, in certain cases, other factors may be taken into consideration. These include: the quality of the defendant's product, actual consumer confusion, the good faith of the defendant, and, the sophistication of the relevant purchasers. *See McGregor-Doniger, Inc. v. Drizzle, Inc., supra*, at 1130 and cases cited therein.

The Court's immediate concern centers upon plaintiff's effort to seek protection solely for the name "Saratoga", which it now claims is the salient feature of its combination marks registered with the Patent Office.

The registration of the marks, "Saratoga Vichy" and the entwined "S" "V" logo, was pursuant to the provisions of the 1905 Act. That statute precluded the registration of marks which were "merely a geographic term or name". [§ 5(b)]. Nevertheless, a ten year proviso was also incorporated into § 5, the consequence of which was to allow registration of any mark which had been in actual and exclusive use "for ten years next preceding February twentieth, nineteen hundred and five". Plaintiff's marks qualified for registration in accordance with this proviso.

The Lanham Act eased the restrictions upon the registration of geographically descriptive marks. Thus, the present statute precludes registration of marks on the Principal Register that are "primarily geographically descriptive". 15 U.S.C. § 1052(e)(2). Section 1052(f) permits registration of geographical marks "which [have] become distinctive of the applicant's goods in commerce". *Prima facie* proof of such distinctiveness is shown by "substantially exclusive and continuous use" of the mark for five years.

The motive underlying this change from the predecessor statute was appropriately summarized in a recent decision of the Patent & Trademark Office Trademark Trial & Appeal Board:

With the use of the words "primarily geographically descriptive," the Act of 1946 through the Section 2(f) provisions . . . did away with the "archaic" ten year proviso, and brought the secondary meaning concept into a realistic and sensible approach consonant with the prevailing court decisions.

*In re Charles S. Loeb Pipes, Inc.*, 190 USPQ 238, 243 (TTAB 1976). *See Community of Roquefort v. William Faehndrich, Inc.*, 303 F.2d 494, 496–97 (2d Cir. 1962).

Plaintiff registered its two earlier marks, in combination, under the provisions of § 1052(f). As a consequence, the marks, "Saratoga Vichy" in combination and the fanciful logo had become distinctive of plaintiff's goods in commerce—they had acquired secondary meaning.

This fact, however, hardly forecloses further inquiry. The salient facts remain that: 1) the name "Saratoga", standing alone, is not registered as a trademark; 2) the relevant case law discloses that the strength of plaintiff's mark has been in combination form; 3) plaintiff has not only abandoned its distinctive trade dress which incorporat-

ed its marks upon the labels of its bottled water product, but, has also abandoned its celebrated and well-known product—Saratoga Vichy.

It is established doctrine that words which are merely descriptive of the place where an article is manufactured or produced, cannot be monopolized as a trademark. *Canal Co. v. Clark*, 13 Wall. 311, 20 L.Ed. 581 (1872). Nevertheless, where a geographical name has acquired distinctiveness as an indication of the origin of the goods—secondary meaning—it may be protected from unfair competition, even though it was not subject to registration. *Elgin National Watch Co. v. Illinois Watch Case Co.*, 179 U.S. 665, 674, 21 S.Ct. 270, 274, 45 L.Ed. 365 (1901).

On the authority of *Atlantic Monthly Co. v. Ungar Publishing Co., Inc.*, 197 F.Supp. 524, 528–29 (S.D.N.Y.1961), this Court concurs in the defense contention that absent registration of the name "Saratoga" alone, as applied to plaintiff's present bottled water product, no statutory action will lie under § 1114 of the Lanham Act. The degree of protection to which the plaintiff is entitled, if any, may be premised upon the law of unfair competition. *Id.*, at 528–9. Of course, the use of an unregistered mark may still be protected under § 1125(a). *Dallas Cowboys Cheerleaders, Inc. v. Pussycat Cinema, Ltd.*, 604 F.2d 200, 203 (2d Cir. 1979).

The inquiry under claims of unfair competition is essentially the same as that for infringement. *Mushroom Makers, Inc. v. R. G. Barry Corp., supra*, 580 F.2d at 47. Accordingly, the initial inquiry here is whether the name "Saratoga" has an origin-indicating quality in the eyes of the purchasing public.

Plaintiff shoulders a heavy burden to establish secondary meaning. Herein, the plaintiff is not assisted by its statutory recognition of distinctiveness arising from its 1967 registration under § 1052(f) of the Lanham Act. The marks which had acquired secondary meaning through long usage were "Saratoga Vichy" and the fanciful logo. This fact was recognized in *Saratoga Vichy Spring Co. v. Saratoga Carlsbad Corp., supra*, 45 F.Supp. at 262, wherein the Court stated:

> I do not hold that defendants may not use the word "Vichy", or that they may not use the name "Saratoga" in connection with their product, but I do hold that they may not use the combination together, "Saratoga Vichy", which I find by long usage, exclusively by the plaintiff (since 1873), has acquired a secondary meaning. Down through the years (from 1873) the plaintiff has been bottling and selling its product under the distinctive name "Saratoga Vichy".

So viewed, the name "Saratoga", standing alone, only has a geographical connotation; consequently, the necessity arises to prove secondary meaning.

The test of secondary meaning focuses upon the effectiveness of the efforts engaged in to create it, such effectiveness being measured by the consumer's reaction to the mark; namely, the consumer awareness that the product emanates from a single, although possibly anonymous source. *Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 118, 59 S.Ct. 109, 113, 83 L.Ed. 73 (1938); *Carter-Wallace, Inc. v. Proctor & Gamble Co.*, 434 F.2d 794, 802 (9th Cir. 1970); *Aloe Creme Laboratories, Inc. v. Milsan, Inc.*, 423 F.2d 845, 849–850 (5th Cir. 1970), *cert. denied*, 398 U.S. 928, 90 S.Ct. 1818, 26 L.Ed.2d 90 (1970); 3 R. Callman, The Law of Unfair Competition, Trademarks & Monopolies § 77.3, at 360 (3d ed. 1969).

Generally, the factors relevant to the issue of secondary meaning include: the amount and manner of advertising, volume of sales, the length and manner of the mark's use, direct consumer testimony and consumer surveys. *RJR Foods, Inc. v. White Rock Corp.*, 603 F.2d 1058, (2d Cir. 1979); *Union Carbide Corp. v. Ever-Ready, Inc.*, 531 F.2d 366, 380 (7th Cir. 1976), *cert. denied*, 429 U.S. 830, 97 S.Ct. 91, 50 L.Ed.2d 94 (1976); *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, 341 F.Supp. 129, 133–34 (S.D.N.Y.1972).

■ And, of course, a claim of secondary meaning presents a question of fact. *Speed Products Co. v. Tinnerman Products, Inc.*, 222 F.2d 61, 66 (2d Cir. 1955).

■ At this juncture, a brief review of the provisions of the summary judgment rule is warranted. Rule 56(e) provides that when a motion for summary judgment is supported by the evidentiary material listed in Rule 56(c), an adverse party may not rest his opposition upon mere conclusory allegations or denials.

As recently noted:

[T]he policy favoring efficient resolution of disputes which is the cornerstone of the summary judgment procedure, would be completely undermined if unsubstantiated assertions were sufficient to compel a trial.

*SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978).

■ Thus, the party opposing summary judgment must set forth particular evidentiary matters which disclose the presence of genuine issues of material fact. He may not hold back such evidentiary material until the trial; nor, may he avoid the entry of summary judgment by some unsubstantiated hope that his proof will be borne out by discovery. *See Community of Roquefort v. William Faehndrich, Inc.*, *supra*, 303 F.2d at 497–98.

Herein, plaintiff has relied almost exclusively upon conclusory allegations that the consuming public has come to associate the name "Saratoga" as the short-hand designation for its bottled beverages. There is not a scintilla of evidence in terms of consumer surveys or affidavits from consumers which discloses such reaction to plaintiff's products in terms of their origin-indicating quality.

Plaintiff states that it has engaged in extensive advertising and experienced substantial sales for its bottled water products. The Court acknowledges that such evidentiary indicia are usually considered relevant to a determination of secondary meaning. Nevertheless, two overriding and undisputed facts also appear on the record. First,

an overwhelming majority of these advertising expenditures and product sales were attributable to plaintiff's "Saratoga Vichy" and associated beverages, all of which appeared in distinctive trade dress wherein plaintiff's registered combination marks were incorporated upon the labels. The record, however, is devoid of any showing as to the *success* of its advertising expenditures or sales volumes in terms of the consuming public's association of the name "Saratoga" exclusively with the plaintiff, either prior to 1978, or, since then.

■ It is well established in trademark litigation that advertising and sales statistics alone are not probative of the extent of consumer awareness of a mark as identifying a particular source of the product. *HMH Publishing Co. v. Brincat*, 504 F.2d 713, 719 (9th Cir. 1974); *Mushroom Makers, Inc. v. R. G. Barry Corp.*, 441 F.Supp. 1220, 1227 n. 2 (S.D.N.Y.), *aff'd* 580 F.2d 44 (2d Cir. 1978); *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London*, 378 F.Supp. 403, 411 (S.D.N.Y.1974); *Ralston Purina Co. v. Thomas J. Lipton, Inc.*, *supra*, 341 F.Supp. at 134.

■ A stronger showing of secondary meaning is made by a showing that there exists evidence which is probative of the success of the efforts to popularize a mark. *See e. g., Scarves by Vera, Inc. v. Todo Imports Ltd.*, 544 F.2d 1167, 1170, 1173 (2d Cir. 1976). This is plaintiff's burden in opposition to a motion for summary judgment; however, it has failed to discharge that burden; and, has not offered any mitigating circumstances in excuse of its failure to do so. Rule 56(f), Fed.R.Civ.Pro.

■ Moreover, in considering the issue of secondary meaning in this case, it is significant to note the *present* manner of advertising as well as the length and manner in which the purported mark "Saratoga" has been in use. First, to this date, plaintiff's new product, "Saratoga," has only been marketed for several months. Secondly, it is projected that a little more than a million dollars will be spent in advertising the new product between May and

October 1979. Third, plaintiff has abandoned its "Vichy" and "Club Soda" products as well as its distinctive trade dress and registered marks which had appeared in commerce since the late 19th century. Fourth, the trade dress and labels for the new product are wholly distinct and different from the trade dress previously employed by the plaintiff for its bottled products. Finally, the popularity of mineral water is a relatively recent phenomenon, marked by the astounding commercial success of one importer, to date; and, the entry of as many as thirty competing brands in the large metropolitan areas.

■ Given the above facts, plaintiff's claim of secondary meaning for the name "Saratoga" is to my mind specious. Apart from the fact that it is doubtful that any product in a new and burgeoning market can acquire secondary meaning in such short time (three months for "Saratoga"), *Ralston Purina Co. v. Thomas J. Lipton, Inc., supra,* at 134, it is also unlikely that the public would associate the plaintiff company with a product recently marketed under a new name and new trade dress, not to mention the new corporate name. It appears that the consuming public is more likely, at this early stage, to associate the product with the geographical area rather than a particular company, especially when the mineral waters of Saratoga have been renowned for almost 200 years.

The plaintiff is to be lauded for its marketing sagacity and skill. However, I think it would be wrong as a matter of common sense to allow the plaintiff to bootstrap itself into the monopolization of an historic name, famed in our history, and popularized in song, verse and film throughout the Nation. If plaintiff wishes to procure a mark for the name "Saratoga," it would seem that the proper course is to develop secondary meaning in that name for five years, and then, seek registration upon the Principal Register pursuant to § 1052(f).[3]

*Likelihood of Confusion*

Although the existence of likelihood of confusion must be viewed and considered in the context of a particular case, certain factors, as previously noted, have special relevance to a proper resolution of this issue: verbal, visual and intellective similarity, competitiveness of the products, marketing channels, intent of the defendant, actual confusion and buyer sophistication. *RJR Foods, Inc. v. White Rock Corp., supra,* at 1061.

■ The Court has previously compared plaintiff's predecessor and present marks with the State defendant's mark. Even though the Court has noted the visual dissimilarity of the respective marks, a side by side comparison of the marks is not the proper test. Instead, it is the consumer's state of mind when confronted with the marks individually that forms the acid test. *Union Carbide Corp. v. Ever-Ready, Inc., supra,* 531 F.2d at 382. Thus, as stated in *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* at 1130:

> The law does not require that trademarks be carefully analyzed and dissected by the purchasing public. "It is sufficient if the *impression* which the infringing product makes upon the consumer is such that he is likely to believe the product is from the same source as the one he knows under the trade-mark." (citation omitted) (emphasis in the original).

*Accord, RJR Foods, Inc. v. White Rock Corp., supra,* at 1060.

Plaintiff places considerable reliance upon the fact that "Saratoga" is the salient feature of its registered mark (indeed, it is virtually the only feature, apart from a fanciful "S", that appears on its new product); and, being the only bottler of water products bearing the salient feature "Saratoga" since 1971, plaintiff argues that likelihood of confusion necessarily follows.

This Court does not agree. That similarity is not dispositive of itself. The marks of

---

**3.** A tinge of irony manifests itself herein. That is, plaintiff has for many years established a strong mark in "Saratoga Vichy". Today, however, the term "Vichy" may well be passing into the public domain. By contrast, defendant's mark, "Saratoga Geyser", is not subject to this infirmity since the term "Geyser" is "suggestive".

the plaintiff and defendant Commissioner are presented in different contexts. The color schemes are different in each label. So too, are the colors of the bottles. Significantly, defendant's label clearly identifies that its product is bottled by the State of New York; and, to that end, the State seal is prominently displayed upon the label. *See McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* at 1133; *Warner Brothers, Co. v. Jantzen, Inc.,* 249 F.2d 353, 354 (2d Cir. 1957).

Moreover, plaintiff's present product is simply named "Saratoga". Its predecessor products were entitled "Saratoga Vichy" and "Saratoga Club Soda". Defendant's product, like plaintiff's predecessor, employs a combination mark, "Saratoga Geyser". The combination marks, to my perception, present a closer degree of similarity, aural and visual, yet plaintiff as previously emphasized acquiesced in the side by side existence of the combination marks for a substantial length of time. *See infra.*

In sum the different methods of presentation and overall appearance of the respective marks reduces the potential for confusion on the part of the consumer.

■ Actual confusion on the part of the consumer may be considered in assessing the likelihood of confusion. Although difficult to establish and unnecessary to the plaintiff's case, the absence of actual confusion properly gives rise to an inference that no likelihood of confusion exists. *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* at 1136 and cases cited therein.

■ Again, the Court reiterates the fact of plaintiff's failure to meet the requirements of Rule 56. If plaintiff possessed any evidentiary indicia of actual consumer confusion, this should have been presented to the Court, or at least a showing made of its actual existence. Certainly, if certain customers had been misled, or retailers and/or suppliers had ever observed such instances or received inquiries or complaints that indicated possible confusion, presumably evidence of such occurrences could not have escaped plaintiff's attention, either in its files or the memories of its employees. *McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* at 1136 n. 6.

■ There is no evidence of bad faith on the part of the defendants. The record discloses, and it is not disputed, that the State of New York bottled its waters under the name "Saratoga Geyser" in 1910, twenty-four years after plaintiff's first use of the mark. The essence of bad faith is the adoption of a mark by a junior user for the purpose of obtaining a free ride on the reputation of defendants' mark. *See Triumph Hosiery Mills, Inc. v. Triumph International Corp.,* 308 F.2d 196 (2d Cir. 1962). No such showing has been made, or even suggested upon the present record before the Court.

The level of sophistication of the relevant purchasers is another factor in determining likelihood of confusion. *McGregor-Doniger, Inc. v. Drizzle, Inc., supra* at 1137; *Miss Universe, Inc. v. Patricelli,* 408 F.2d 506, 509 (2d Cir. 1969). Thus:

> The general impression of the ordinary purchaser buying under the normally prevalent conditions of the market and giving the attention such purchasers usually give in buying that class of goods, is the touchstone.

*McGregor-Doniger, Inc. v. Drizzle, Inc., supra,* at 1137 quoting 3 R. Callman § 81.2, at 577. *Accord, RJR Foods, Inc. v. White Rock Corp., supra,* at 1060.

Moreover, there must be a showing of likelihood of confusion by an "appreciable number" of consumers. *Mushroom Makers, Inc. v. R. G. Barry Corp., supra,* 580 F.2d at 47.

On the basis of the record before the Court, it appears that the advertising and sale of mineral water is directed primarily to the sophisticated, health-conscious middle and upper class adult. Apart from that evidence concerning the outstanding commercial success of "Perrier" water, plaintiff has offered no evidence that any significant or appreciable number of consumers of mineral water are casual or unsophisticated purchasers. From my own experience, however, I might add that insofar as a

particular mineral water is concerned, and the Saratoga waters are greatly dissimilar in taste, what may be one man's elixir, to another man may well be Socrate's hemlock. *See* Article, "On the Waterfront— Perrier and Rivals Make Waves", Time Magazine, Aug. 13, 1979, at 76.

In sum, the undisputed facts disclose that consumer's of mineral water tend to be a knowledgeable and sophisticated class of purchasers; consequently, any likelihood of confusion, I think would necessarily tend to be *de minimus.*

Finally, there is one salient fact which pervades this entire discussion of the absence of likelihood of confusion. That is, defendant's product, "Saratoga Geyser", has been unavailable to the purchasing public for eight years. Given the present absence of a competing product by the defendants, coupled with plaintiff's most recent efforts to promote its new product, "Saratoga", the issue of likelihood of confusion is not only premature, it is speculative.

In reality, in my judgment, this is not so much an action for trademark infringement, as it is merely a means of gaining a competitive advantage and protecting an investment, both of which would tend to suffer some adverse impact, not so much from the presence of a competitor who employs the name "Saratoga" in its mark, but primarily from a competitor whose product may well be subject to appropriate labelling from the New York Department of Health.

*Laches*

The doctrines of laches offered as decisive by defendants and of acquiescence by plaintiff are elusive and complex when applied to trademark litigation. Generally, the discretionary application of these doctrines necessitates a balancing of the equities between the parties and an examination of all surrounding circumstances.

■■■■ The touchstone for application of the doctrine of laches is unreasonable delay in the assertion of one's mark, or an intent to abandon the use of the mark. *Saxlehner v. Eisner & Mendelson Co.,* 179 U.S. 19, 21 S.Ct. 7, 45 L.Ed. 60 (1900). The

factors to be considered and weighed include: 1) the strength and value of the mark; 2) plaintiff's diligence in the enforcement of his rights; 3) the harm to the plaintiff if relief is denied; 4) the good faith of the defendant; 5) the competitiveness of the parties; and, 6) the harm to the defendant occasioned by the delay. *See Chandon Champagne Corp. v. San Marino Wine Corp.,* 335 F.2d 531 (2d Cir. 1964); *Polaroid Corp. v. Polarad Electronics Corp.,* 287 F.2d 492 (2d Cir.), *cert. denied,* 368 U.S. 820, 82 S.Ct. 36, 7 L.Ed.2d 25 (1961); *Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena,* 293 F.Supp. 892, 917 (S.D.N.Y.1968), *modified and aff'd,* 433 F.2d 686 (2d Cir. 1970).

■■■ The touchstone of acquiescence is conduct of the plaintiff amounting to an express or implied assurance to a defendant that plaintiff will not assert his trademark rights. *Aunt Jemima Mills Co. v. Rigney & Co.,* 247 F. 407 (2d Cir.), *cert. denied,* 245 U.S. 672, 33 S.Ct. 222, 62 L.Ed. 540 (1917); *Carl Zeiss Stiftung v. VEB Carl Zeiss, Jena, supra.*

The parties as noted have bottled and distributed a competitive product under the marks "Saratoga Vichy" and "Saratoga Geyser" for a period of sixty years. Plaintiff has not once given the State or defendant Commissioner notice of infringement during this time, although the State's operations and those of the plaintiff are virtually adjoining. The strength of plaintiff's mark has been in combination form—"Saratoga Vichy" and it has diligently enforced the mark in that form. Plaintiff has failed to show any harm to itself because it has failed to show distinctiveness and likelihood of confusion with its present use of the name, "Saratoga". The present absence of defendant's product in the channels of commerce similarly negates the existence of harm to the plaintiff. Conversely, there would be considerable harm to the State and the present defendant Commissioner. The State of New York has spent enormous sums of money in developing the Saratoga Spa, and, its mineral waters. It has sold these waters extensively through the years under the names "Saratoga Geyser", "Sara-

toga Hathorn", and "Saratoga Coesa".[4] Moreover, a balancing of the equities necessitates an examination of the dichotomous objectives of trademark law. These objectives are: 1) to protect consumers from being misled as to the source of products; 2) to prevent the impairment of a trademark's value to its owner; and, 3) to achieve both of the above objectives consistent with the objective of free competition.

Considering the totality of the circumstances herein and the objectives of trademark law, in my judgment, the doctrine of laches should be imposed as a bar to any relief sought by the plaintiff. Plaintiff has wholly failed to account for its delay and acquiescence in permitting another party to market a bottled mineral water wherein a common feature of the other parties' marks was the name, "Saratoga".

*Abandonment*

Plaintiff finally attempts to rely upon the doctrine of abandonment as a means of denying defendants any right to use the mark, "Saratoga Geyser". In that regard, plaintiff relies upon the provisions of 15 U.S.C § 1127(a) which provides that nonuse of a mark for two consecutive years constitutes *prima facie* abandonment. It is not disputed that the State has not bottled and marketed its product, "Saratoga Geyser", since 1971. To begin with, the Court does not deem it necessary to decide whether the abandonment provisions of the Lanham Act are applicable to marks that are not registered with the Patent Office.

Nor does the Court deem it necessary to focus upon the defendant's intent regarding abandonment. Plaintiff, of course, has framed its arguments in terms of the defendant's intent, mindful of the fact that such questions are rarely appropriate for disposition via the procedural device of summary judgment. *See generally* 10 Wright & Miller, Federal Practice & Procedure § 2730 (1973).

It is ancient doctrine that evidence tending to establish abandonment may be overcome by a showing that there never was an intent to abandon a mark. *Saxlehner v. Eisner & Mendelson Co., supra,* 179 U.S. at 31, 21 S.Ct. at 11. The Court's examination of the record, however, supports the defense contention that the issue of abandonment is indeed a "red herring".

The critical and undisputed fact underlying the discontinuation of the State's bottling plant operations was the audit conducted by the New York State Comptroller. This audit revealed that under the "present mode of direct Reservation operation of the bottling plant", there had been substantial operating losses. As a consequence, the Comptroller recommended that the state discontinue operations and efforts be made to sell or lease the facility. Upon issuance of this report, the State legislature refused to appropriate funds for the operations of the bottling plant in 1971–72 by the Office of Parks and Recreation.

This action by the State legislature is critical to the resolution of the question of abandonment since evidence of abandonment may also be overcome by a showing of extraordinary circumstances which excuse nonuse. *Menendez v. Saks & Co.,* 485 F.2d 1355, 1377 (2d Cir. 1973), *rev'd on other grounds, sub nom., Alfred Dunhill of London, Inc., v. Cuba,* 425 U.S. 682, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Garcia v. Montecrispi Cigar Co.,* 409 F.2d 14 (5th Cir. 1969) (expropriation of factory by foreign government). In my judgment, the actions of the State legislature in refusing to appropriate funds for the operation of the bottling plant is a sufficient predicate to excuse the nonuse for really a short period in relation to use of the mark, "Saratoga Geyser". In short, the nonuse of the mark was a consequence of a public policy determination premised upon legislative budgeting of public moneys over which the defendants had no control.

---

**4.** The defendants have not raised the issue; however, there is authority for the proposition that a mark which is descriptive, yet registered or protected on the basis of acquired secondary meaning, will not ordinarily prevent others from using the term in its primary sense. *See e. g., Field Enterprises Ed. Corp. v. Cove Industries, Inc.,* 297 F.Supp. 989, 995 (E.D.N.Y.1969).

**156**

*State Statutory Claims*

■ Plaintiff's complaint also sets forth two claims for relief premised upon the provisions of State statutes. N.Y.Gen.Bus. Law §§ 368–b (trademark infringement) and 368–d (injury to business reputation and dilution).

Plaintiff's claim for infringement under § 368–b suffers from the same infirmity as its claim under § 1114 of the Lanham Act; namely, a failure to register the mark, "Saratoga" alone. The record discloses that plaintiff's registrations under the provisions of New York law have always been combination marks. Any rights in the mark "Saratoga" would necessarily arise under the law of unfair competition; however, as previously noted, plaintiff has failed to discharge its burden under its unfair competition claim.

Plaintiff's claim for injury to business reputation and dilution does not fare any better upon this record. Although the relief afforded by § 368–d is broader than that available under actions for trademark infringement and unfair competition because likelihood of confusion or competition need not be shown, to merit protection, plaintiff must still prove that its mark bears a "distinctive quality". In short, plaintiff must show that it has a strong mark, or, that its mark has acquired secondary meaning. *Allied Maintenance Corp. v. Allied Mechanical Trades, Inc.*, 42 N.Y.2d 538, 543–45, 399 N.Y.S.2d 628, 369 N.E.2d 1162 (1977). The mark, "Saratoga" is geographically descriptive; and, plaintiff has failed to show any indicia of that name, apart from its distinctive combination marks, having acquired any secondary meaning.

■ The motions of defendants for summary judgment are granted and judgment shall enter in favor of the defendants declaring: 1) that the State of New York's trademark, "Saratoga Geyser", does not infringe on plaintiff's trademark, "Saratoga Vichy"; 2) that the State of New York's use of the trademark, "Saratoga Geyser", does not constitute a violation of 15 U.S.C. § 1125(a); 3) that the State of New York's trademark does not constitute an act of unfair competition with plaintiff; 4) that the State of New York's use of the trademark "Saratoga Geyser" is not infringement or dilution of plaintiff's New York State trademark registration, nor does the use of the trademark "Saratoga Geyser" cause injury to the business reputation of the plaintiff; 5) that the plaintiff is guilty of laches.

Summary judgment shall enter in favor of the defendants accordingly, and the complaint is dismissed in its entirety as a matter of law.

It is so Ordered.