Roy P. TERRY and Vicki S.
Terry, Plaintiffs,

v.

INTERNATIONAL DAIRY QUEEN,
INC., and American Dairy Queen
Corporation, Defendants.

No. F 80–189.

United States District Court,
N.D. Indiana,
Fort Wayne Division.

Jan. 13, 1983.

Leonard E. Eilbacher, Fort Wayne, Ind., for plaintiffs.

N. Reed Silliman, Fort Wayne, Ind., David R. Kelly, Minneapolis, Minn., for defendants.

## MEMORANDUM AND ORDER

SHARP, Chief Judge.

### I.

The evidence in this case presents an interesting example of the evolution of a major fast-food franchise operation in post-World War II America.

The Court is here called upon to determine and declare certain rights of the parties in this historical context.

The case was well tried before this Court and has been thoroughly briefed and oral argument has been heard.

### A.

All rights with respect to the use of "Dairy Queen" trade name in Indiana before 1948 were owned by H.A. McCullough and J.F. McCullough (McCulloughs) of Geneseo, Illinois. Mr. McCullough has been instrumental in the development of the now familiar freezing and dispensing machine for soft-serve ice cream.

On November 10, 1948, McCULLOUGHS assigned a license to use the patented machine and the Dairy Queen trade name for the entire State of Indiana to A.G. Shine (Trial Witness) and Doris Shine (SHINES) of Kokomo. The terms of the license are described in the freezer and Territory Agreement between McCULLOUGHS and SHINES. (Plaintiffs' Ex. 4, typewritten copy Plaintiffs' Ex. 5).

The word "license" is used to distinguish it from the relationship commonly known as a "franchise", because a franchise is defined as "a contract by which a franchisee is granted the right to engage in the business of dispensing goods or services under a marketing plan or system prescribed

in substantial part by the franchisor." Ind. Code § 23–2–2.5–1. In contrast, a license is the device by which the owner of a trademark authorizes another to use it, but at the same time, remain the owner of the mark. Trade-Marks and Unfair Competition, 68 Harvard L.Rev. 814, 871 (1955).

The McCULLOUGH–SHINE agreement for the State of Indiana contained no marketing plan. That license contained no prohibition against the sale of food and beverage items. Its sole restriction with respect to products to be sold in Indiana was as follows:

"8. That the Second Party or any others, shall not sell or offer for sale any other frozen or semi-frozen *dairy product,* use any other type or make of freezer, assign this agreement or sell any of the said freezers, without first obtaining the written consent and approval of first party. * * *" (Emphasis added.)

In 1949, SHINES opened the first Dairy Queen store in Indiana on Markland Avenue at Kokomo. They also proceeded to grant sub-licenses to others, and on March 15, 1949, SHINES assigned their rights to the south half of Fort Wayne and Allen County to Jessie G. Filler and Rogers F. Filler (FILLERS), (both trial witnesses), by a Freezer and Territory Agreement—(Sub) Agreement. (Plaintiffs' Ex. 1).

At about the same time, the license for the north half of Fort Wayne and Allen County was assigned to the owners of what came to be known in the evidence as the Parnell Avenue store, and, shortly thereafter, the Lima Road store. Anthony Shine acknowledged that the same form of sub-license was used during that period for all the sub-licenses (Tr., p. 78, 93). That form, as seen in Plaintiffs' Ex. 1, provided:

"6. That the Buyer agrees that Dairy Queen will be the only *product* sold on the premises without the approval of the Seller, and that the Buyer will not use any other type of make of freezer, assign this agreement or sell any of the freezers without first obtaining the written consent and approval of seller." (Emphasis added.).

It is this provision which is relevant to this case, since TERRYS succeeded to their sub-license.

### B.

FILLERS opened the Oxford Street store (later acquired by these plaintiffs) in 1950. In about 1954 or 1955, in order to compete with other nearby stores selling ice cream *and* food, FILLERS put in a line of pre-packaged sandwiches heated in an infra-red oven, which line included hamburger and cheeseburger sandwiches. Roger Filler testified that Anthony Shine, his licensor, had suggested the introduction of food items to the product line of that store. (Tr., p. 44–46). That particular sandwich line was not profitable and soon was discontinued in favor of a home-made sandwich food line. FILLERS also purchased a fountain and sold a variety of non-Dairy Queen beverages and soft ice cream/beverage combinations. As Rogers Filler testified, we "pioneered our way." (Tr., p. 55). The products he developed were determined by the customers' demand, and he used his own sources of food supplies, cones, and containers. (Tr., p. 49, 52). No one prescribed the size, shape, or how to make any dairy, food, or beverage item, and FILLERS "felt our way along." (Tr., pp. 43–48).

Thus, for the approximately 25 years before the purchase by plaintiffs, the Oxford Street store sold dairy, food and beverage items. Mr. Filler testified that Mr. Shine was a frequent visitor and consultant during the development of the product line of the store, and never placed any limitation whatever as to any type of food sold. (Tr., p. 68). Mr. Shine testified that he neither approved nor disapproved the sale of food from the Oxford Street store, or any other store in Fort Wayne. (Tr., p. 97, 98). He was a frequent visitor to all of the Fort Wayne stores between 1950 and 1968, in which latter years SHINES assigned their license to defendants. (Plaintiffs' Ex. 6). Mr. Shine never disapproved the sale of any food item in Fort Wayne.

The third Fort Wayne store, which was located on Lima Road, was governed by the same form of agreement and was founded in the early 1950s. Rogers Filler generally was acquainted with the menu items at both the early Parnell Avenue and Lima Road stores. While FILLERS never had a grill in the Oxford Street store there was a grill at Lima Road for frying hamburgers which were served there. Mrs. Filler testified that SHINES (Mr. Shine) gave Fillers oral permission to sell food, without any limitation. (Tr., p. 212, 213). While Fillers did not desire a grill, SHINES never prohibited a grill, or any other food sale practice. (Tr., p. 212, 213).

Defendants concede that there was never any legal restriction on Anthony Shine before the year 1968 to *waive* the provision of paragraph 6 of the SHINE–FILLER agreement that Dairy Queen "will be the only product sold on the premises." (Answers of Defendants to Interrogatory No. 15, admitted into evidence at Tr., p. 118). Similarly, defendants concede that there was no legal restriction on SHINES before 1968 to grant an approval of the sale of products *other* than Dairy Queen at the Oxford Street store. (Answer of Defendants to Interrogatory No. 18, admitted at Tr., p. 118).

At one time or another, FILLERS sold at the Oxford Street store, without objection by SHINES *or defendants,* the following non-Dairy Queen products, in spite of the "paragraph 6" recitation:

hamburger sandwiches
cheeseburger sandwiches
Polish sausage sandwiches
barbecue sandwiches
sloppy joe sandwiches
ham sandwiches
ham and cheese sandwiches
hot dogs
coney dogs
potato chips
a variety of beverages (Tr., pp. 45, 46, 67, 126)

During the entire period, the various Dairy Queen signs and logos were prominently displayed on and about the store, including, for part of the time, a "Parrot Meats" sign and picture of a hot dog on the roof. (Plaintiffs' Ex. 2). (FILLERS did not actually operate the store after the early 1970s, having sold it on a conditional sales contract to BONNER, but the sale of food continued unabated until TERRYS took the assignment form FILLERS in 1978).

On October 3, 1978, Roy Terry and Vicki Terry (TERRYS) acquired the Oxford Street store from FILLERS by an Assignment of Freezer and Territory Agreement, which incorporated the SHINE–FILLER Agreement. (Plaintiffs' Ex. 1). At that time, the Oxford Street store was not selling hamburgers and cheeseburgers, but was selling the other non-Dairy Queen items listed above. TERRYS had actually been operating the store for about three weeks before October 3, 1978, and had committed to the purchase of the store. (Tr., p. 119). TERRYS have continuously operated their store, which since has been moved, under the terms of the SHINE–FILLER Agreement (including all interpretations, approvals, and waivers by those contracting parties). At no time have TERRYS entered into any agreement modifying or diminishing their rights under the SHINE–FILLER Agreement, and specifically, they have not entered into any new contract with defendants, despite the pressure applied by defendants to get TERRYS to sign a Brazier agreement.

C.

In 1960, which was after the granting of the plaintiffs' sub-license to FILLERS in 1949 and before reassigning the Indiana rights to these defendants in 1968, SHINES and McCULLOUGHS redefined their rights under the old 1948 agreement, and SHINES tightened up their sub-license form for subsequent store owners. (Tr., p. 83, 84). For example, SHINES started a "Dairy Queen Food Program" in 1966 (Defendants' Ex. H), in other places in Indiana, but not in Fort Wayne. (Tr., p. 104, 105, 107).

In 1962 the defendant corporations had been formed and entered into the hamburger business, and gave to SHINES a Brazier

license for the State of Indiana. The first Brazier store in this State was located at Muncie in 1963. (Answers of Defendants to Interrogatories Nos. 156, 13 and 14, admitted at Tr., p. 118. The defendants did not invent the hamburger and cheeseburger sandwiches and they acknowledge that they were not the first chain to introduce the single-double-triple configuration options, which they here seek to protect. (Answers of Defendants to Interrogatory No. 66, admitted at Tr., p. 118.)

In 1968, SHINES reassigned their remaining Indiana rights (not including their store interest) to defendants, International Dairy Queen, Inc. and American Dairy Queen Corporation. (Plaintiffs' Ex. 6).

### D.

TERRYS acquired the SHINES' rights by an assignment of the 1949 sub-license on October 3, 1978. They operated the store on Oxford Street from September, 1978, until the seasonal closing in mid-October, 1978, and continue to sell food and beverage items. (Tr., pp. 119, 125).

While Mr. Filler does not recall having seen the November 18, 1975 letter from International Dairy Queen to FILLERS (Defendants' Ex. A), Mrs. Terry believes that she saw it at the closing for the first time. (Tr., pp. 64, 157, 158). The letter told FILLERS *for the first time* in 1975 that products sold in the store must be "in accordance with Article 6 of your Franchise and Territory Agreement." As of the date of the letter, FILLERS had been selling food and beverage products for over 20 years with approval, and they and their assignees continued to do so without any objection. They did not yield to the "suggestion" in the letter that they execute a Brazier agreement. When TERRYS first saw the letter at the closing, they had committed contractually to purchase the store and had, in fact, been operating it as their own for about three weeks.

In November, 1978, the Regional Manager and his assistant came to the Terrys' home and attempted to pursuade them to sign a Brazier agreement, but did not leave a copy. (Tr., p. 174).

In December, 1978, after TERRYS had closed for the season, they received the letter from International Dairy Queen, Inc. dated December 5, 1978. (Defendants. Ex. C), which indicated that the consent to the assignment was not an acquiescence "in or to the mode or manner of operation" of the store. TERRYS believed the reference to be to "bootleg" of non-approved ice cream mix which had been used by their predecessor. (Tr., pp. 142, 143). They heard no more on the subject, and heard nothing about the representation in the letter that Dairy Queen would "in the near future promulgate a program which will have a significant bearing." In fact, during the full season of 1979, although they had deleted sloppy joes from the menu, they continued to sell hot dogs, coney dogs, barbecue sandwiches, ham sandwiches, ham and cheese sandwiches, Polish sausage sandwiches, potato chips, and a variety of non-Dairy Queen beverages. (Tr., p. 126).

After closing the Oxford Street store in the late Fall, 1978, TERRYS purchased a closed Shell Oil station at a preferable location on Rudisill Avenue, and remodeled it into an attractive Dairy Queen store with inside seating. (Tr., p. 173). The Oxford Street License and equipment was transferred to the Rudisill store, which opened at the beginning of the season in March, 1979.

During the first full season of TERRYS in the new store location in 1979, the defendants commenced a nationwide television advertising campaign in which the clear and unmistakeable message was repeated that "Dairy Queen" stores sell hamburgers. In the five advertisements shown at trial on the film (Defendants' Ex. P.), the jingle was repeated: "We make a burger at Dairy Queen;" and "When we make a burger at Dairy Queen, we treat you right;" and "More burger than bun at Dairy Queen" or substantially similar words. (Tr., pp. 255, 256). During the singing of the jingles, the frying and serving of hamburgers was depicted, and also the red Dairy Queen logo was repeatedly flashed. Only in a brief glimpse was the Brazier logo

shown on a Dairy Queen sign pole, similar to that sign in front of the store show in Plaintiffs' Ex. 12. In these there is no oral reference to Brazier establishments. Notwithstanding the jingles in the television commercials to the contrary, defendants acknowledge that "the sale of hamburgers has never been authorized by defendants in a 'Dairy Queen' establishment." (Answer of Defendants to Interrogatory No. 11, referred to at Tr., p. 25).

Roy Terry testified that, in the season of 1979, after the television advertising campaign had commenced, many customers each day came into his store and ordered hamburgers, and left, angry and sometimes abusive, after having waited in line, when advised hamburgers were not sold in the store. (Tr., pp. 293, 295). Because of the demand created for hamburgers, and in keeping with the tradition of self-determination in that store as to food sales, a grill and fryer were added to the store during the Winter of 1979–80, and upon opening in March, 1980, the menu was *expanded* to include hamburgers, cheeseburgers, french fries, and the like. (Tr., pp. 128, 293). In March, 1980 TERRYS received the letter from the Regional Manager of defendants that their expanded food line was in violation of paragraph 6 of the SHINE–FILLER agreement of 1949, in which letter it was again demanded that TERRYS sign a Brazier agreement (Plaintiffs Ex. 11, and Defendants' Ex. E). TERRYS have continued to sell the food and beverage items, and on September 30, 1980, filed this action for declaratory judgment, by which they seek to have it declared that their food sales do not constitute a breach of their 1949 sublicense.

## II.

The issue of whether plaintiffs have breached the 1949 SHINE–FILLER agreement is raised, both by the prayer of the Complaint that the Court declare they are not in breach, and by Count II of the Counterclaim which asserts such breach.

Plaintiffs assert that they have not breached the contract by the sale of certain food items because (1) there is no express prohibition in the contract and the parties did not intend any such prohibition; (2) even if the contract were interpreted to prohibit such sales, there was a parol modification of such prohibition; and (3) the licensors of Dairy Queen have waived any such prohibition by their encouragement of food sales over a period in excess of 20 years.

Paragraph 6 of the 1949 SHINE–FILLER Freezer and Territory Agreement—(Sub)Agreement provides as follows:

"6. That the Buyer agrees that Dairy Queen will be the only product sold on the premises without the approval of the Seller, and that the Buyer will not use any other type or make of freezer, assign this agreement or sell any of the said freezers without first obtaining the written consent and approval of the Seller." (Plaintiffs' Ex. 1)

That agreement granted a license to FILLERS to use the Dairy Queen freezer and name in the south half of Fort Wayne and Allen County. On its face, it would appear that the parties intended a prohibition against the sale of every product, except soft-serve ice cream, without written consent and approval. From the very beginning of the business now owned by plaintiffs, FILLERS sold non-Dairy Queen beverages and, very soon thereafter, a non-Dairy Queen food line.

SHINES only acquired the license, and the right to sub-license, in the year 1948. SHINES opened their store in Kokomo in 1949 and the plaintiffs' store in the following year was the second in the State. There was no marketing plan or uniformity whatever at that time. That the parties didn't even contemplate the subject of food sales is shown by the similar provision in the 1948 McCULLOUGH–SHINE license agreement for the State which expressly dealt only with ice cream:

"8. That the Second Party or any others, shall not sell or offer for sale any other frozen or semi-frozen dairy product, use any other type or make of freezer, assign this agreement or sell any of the said

freezers, without first obtaining the written consent and approval of the First Party. That a copy of each sub-contract shall be forwarded to the office of the First Party and Ar-Tik Systems, Inc., within ten days after it is completed and signed." (Plaintiffs' Ex. 4, typed copy Plaintiffs' Ex. 5)

The literal words of the disputed provision of the sub-license do not absolutely prohibit the sale of non-Dairy Queen products, but only the sale of such products "without consent and approval." The sub-license was not intended to be more restrictive than the license, and both prohibited only the sale of any other ice cream product and the use of any other freezer.

The parties have conceded that the contractual non-trade mark issues are governed by the substantive law of Indiana.

■ An ambiguity in a contract may be either "patent" or "latent," the former arising where the words used appear to have a clear meaning, but do not affect the meaning the parties intended. *Board of Directors, Ben Davis Conservancy District v. Cloverleaf Farms, Inc.,* 171 Ind.App. 682, 359 N.E.2d 546 (1977). In such case, it is proper for the Court to determine the intent of SHINES and FILLERS at the time the contract was made as disclosed by the language they employed; however, if the reasonably intelligent persons could come to different conclusions as to the construction of the contract, then rules of contract construction and inquiry into extrinsic circumstances may be resorted to. *Shahan v. Brinegar,* Ind.App., 390 N.E.2d 1036 (1979).

The extrinsic evidence urged here by plaintiffs is the McCULLOUGH–SHINE license agreement, and the course of dealing of SHINES and FILLERS from the outset with respect to their agreement in the operation of plaintiffs' business. The same is relevant and considered.

■ The rule of construction is the familiar rule that the terms of a contract are construed in favor of the non-drafting party. *English Coal Co. v. Durcholz,* Ind.App., 422 N.E.2d 302 (1981); *Chrysler Corp. v.*

*Hanover Insurance Co.,* 350 F.2d 652 (7th Cir.1965); *Philco Corp. v. Automatic Sprinkler Corp.,* 337 F.2d 405 (7th Cir.1964). The evidence was that this was the standard form of contract employed by SHINES before 1960 (and the form used for the early Parnell Avenue and Lima Road stores in the north half of Fort Wayne, which also sell various foods). Had SHINES wished to prohibit the sale of food and make the sub-license more restrictive than their license, they easily could have expressed that intention.

■ Even if there were no ambiguities in the SHINE–FILLER Agreement, it is abundantly clear from the evidence that there was a parol modification of paragraph 6 to permit the sale of food items. A written contract may be changed, modified, waived in whole or in part by a subsequent one, express, written, oral, or implied. *McCoun v. Shipman,* 75 Ind.App. 212, 128 N.E. 683 (1920).

The evidence was that FILLERS sold non-Dairy Queen beverages from the outset in 1950 and soon thereafter adopted a food line (including hamburgers) at the suggestion of Anthony Shine, the sub-licensor, and that the sale of a variety of sandwiches has continued to the present. The decision as to what food to sell from time to time was exclusively that of the store operator and Mr. Shine supported the food sales. Never was the subject of a need for any written approval entertained by the parties until after the defendant organizations were formed and entered the food business, and each attempt thereafter by the defendants to persuade the sub-licensee to sign a new agreement was rebuffed. The parol modification of the 1949 sub-license to permit the sale of food without written approval is implied from the consent of the parties and the sale of food from the early 1950s until the recent attempts of defendants to enforce the literal meaning of paragraph 6.

Plaintiffs' Complaint for declaratory judgment asserts that, even if the contract prohibited the sale of food without written consent and approval, the sub-licensor waived such right. Before 1968 these de-

fendants had only the rights of the licensor, McCULLOUGH, and that license didn't prohibit the sale of food. Only upon the purchase of SHINES interest in the license in 1968 could the defendants have any standing to insist upon enforcement of the 1949 agreement. For all the years between the opening of plaintiffs' store in 1950 and 1968, there was never any objection whatever to the sale of any food or other non-Dairy Queen products (Beverages). Further, even after 1968, the defendants made no objection until the Tellegen/Filler form letter "objection" of November 18, 1975. (Defendants' Ex. A; Answer of Defendants to Interrogatory No. 76, admitted at Tr., p. 118).

The failure of the sub-licensor to object for a period of at least 25 years with full knowledge of the sale of non-Dairy Queen products for that period surely constitutes a waiver of the requirement of written approval.

■ The waiver of a contractual provision may be impliedly waived by the "knowing and willing acquiescence" of the party for whose benefit the provision was inserted. *Unishops, Inc. v. May's Family Centers, Inc.*, Ind.App., 399 N.E.2d 760, 766 (1980). The nature and effect of such a waiver was expressed in *Whipple v. Prudential Ins. Co. of America*, 222 N.Y. 39, 118 N.E. 211 (1917), at 213 as follows:

> "A waiver, not express, found in the acts, conduct, or language of a party, is rarely established as a matter of law rather than as a matter of fact. This conclusion inheres in its nature and character. A waiver is an intentional abandonment or relinquishment of a known right or advantage which, but for such waiver, the party would have enjoyed. It is the voluntary act of the party, and does not depend upon a new contract, new consideration, or an estoppel. It cannot be recalled or expunged. (Citations omitted.) It is essentially a matter of intention. Negligence, oversight, or thoughtlessness does not create it. The intention to relinquish the right or advantage must be proved. Occasionally it is proved by the express declaration of the party, or by his undisputed acts or language so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a reasonable inference to the contrary. Then, the waiver is established as a matter of law. Commonly it is sought to be proved by various species of proofs and evidence, by declaration, by acts, and by nonfeasance, permitting differing inferences, and which does not directly, unmistakably, or unequivocally establish it. Then it is for the jury to determine from the facts as proved or found by them whether or not the intention existed. (Citations omitted.) The evidence must have probative force sufficient to prove that there was in fact an intention to waive the right or benefit—a voluntary choice not to claim it. The acts and language of the party must be given, as evidence, their natural and logical effect under the circumstances of the case."

■ The uncontradicted evidence was that:

(a) Non-Dairy Queen beverages were sold since 1950 at plaintiffs' store without any objection for 25 years, and without any insistence on written approval;

(b) The first hamburger and other sandwiches were sold in plaintiffs' store in the early 1950s at the suggestion of defendants' predecessor, and a variety of sandwiches had been sold since;

(c) Defendants' predecessor was a frequent visitor to the store during each season and had full knowledge of the menu;

(d) The store for some period of years had a "Parrot Meat" sign depicting a hot dog on the roof alongside a large Dairy Queen milkshake depiction; (Plaintiffs' Ex. 2).

(e) The defendants succeeded to the rights of the sub-licensor in 1968 and made no objection or comment concerning the food sales until the year 1975, and no specific insistence on enforcement of the alleged prohibition was made until March, 1980, nearly 30 years after sales of non-Dairy Queen products began. (Plaintiffs' Ex. 11).

The defendants, and particularly their predecessor, the SHINES, waived any right to approve or disapprove the sale of food items in plaintiffs' store. Such a waiver cannot be recalled or expunged. *Whipple v. Prudential Ins. Co. of America, supra.*

## III.

The contentions of defendants with respect to their action for trademark infringement are fixed by their amended Answer to Interrogatory No. 50, as follows:

"Defendants do not contend that plaintiffs have used any trademark or service mark owned by defendants other than 'Dairy Queen.' Defendants do, however, contend that plaintiffs have been infringing the 'Dairy Queen' and 'Brazier' trademarks since March, 1980."

Thus, defendants adopt the position that it is the sale of hamburgers, cheeseburgers, fish sandwiches, tenderloin sandwiches, french fries, onion rings, and mushrooms which infringe on the "Dairy Queen" trademark. At trial, the defendants conceded and gave away any claim to an infringement of the "Brazier" trademark.

■ In order to be entitled to relief for the alleged infringement, defendants must have proved that:

(a) they used a trademark of defendants in connection with a sale, without permission;

(b) the sale of the objectionable food items is "likely to cause confusion or mistake," or to deceive purchasers as to the source of origin of the products;

(c) the plaintiffs do not have approval to sell such items.

## A.

■ Plaintiffs concede that defendants have registered the "Dairy Queen" trademark and that they have all rights afforded by the Lanham Act, including its remedies. 15 U.S.C. § 1114. The primary right is the incontestability to the use and control of those trademarks, which right of the defendants these plaintiffs do not dispute. However, the registration of a trademark confers only a procedural advantage and does not enlarge defendants' substantive rights. *Faciane v. Starner*, 230 F.2d 732 (5th Cir.1956). The registration of the marks preserves only those rights inherent in the mark which have not been given away or caused to be eroded by other factors. It has been said that the validity of a trademark and the protection it will be accorded is determined by its "strength and distinctiveness." *Saratoga Vichy Spring Co., Inc. v. Lehman*, 491 F.Supp. 141 (N.D. N.Y.1979) affirmed, 625 F.2d 1037 (2nd Cir. 1980).

Section 32 of the Lanham Act, 15 U.S.C. Section 1114 provides, in part:

"(1) Any person who shall, without the consent of the registrant—

"(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive;

\*     \*     \*     \*     \*     \*

"shall be liable in a civil action by the registrant for the remedies hereinafter provided. \* \* \* "

At trial and in final oral argument, the defendants expressly withdrew any claims for damages and attorney fees under 15 U.S.C. § 1117 and asserted only claims for injunctive relief under this branch of the case.

Sale of the food items which are selectively objectionable to defendants is not likely to add (cause) any confusion to that which already existed in the Fort Wayne market, which confusion was created by (a) the Topsy-like development of Dairy Queen good marketing in Fort Wayne, as permitted and encouraged by defendants' predecessors; and Ib) the marked escalation of such confusion by these defendants' advertising practices in 1979 and thereafter.

The Court is required to determine from the patrons' state of mind whether a likelihood of confusion exists. *Tisch Hotels, Inc.*

*v. Americana Inn,* 350 F.2d 609 (7th Cir. 1965).

While "Dairy Queen" is a "strong" mark in Fort Wayne, and presumably in other places, with respect to soft ice cream, it is a "weak" mark as it relates to the availability or absence of food. That is, the public has no clear perception as to what kind of food is available from an ordinary Dairy Queen store in this market area. The strength of a mark relates, among other things, to "its tendency to identify the goods sold under the mark as emanating from a particular ... source." *McGregor Doniger, Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir. 1980). Hamburgers do not emanate from any particular source in the Fort Wayne market.

For many years, and at the time of this trial, a broad variety of food items, from hamburgers to submarine sandwiches, have been sold in ordinary Dairy Queen stores. Roy Terry identified the photos of the exteriors of several other Dairy Queen stores in Fort Wayne, including one Dairy Queen/Brazier, and enumerated the food items on the menu of each, which menus had no consistency whatever between the stores. (Plaintiffs' Ex. 8, 9, 10 and 12) A variety of food, including hamburgers and cheeseburgers, is available at Dairy Queen stores in this market. It is appropriate to consider the geographical area in which plaintiffs' goods are marketed in making such determination. *Saratoga Vichy Spring Co., Inc. v. Lehman,* supra, at 491 F.Supp. 141, 149.

■ The plaintiffs have always offered the foods and non-Dairy Queen beverages in plain wrappers and containers, and have avoided attaching the Dairy Queen logo to such items. They have never displayed the Brazier logo on the premises. There is no intent to deceive. Dissimilarity in dress is an appropriate consideration in an infringement action. *Ye Olde Tavern Cheese Products v. Planters Peanuts Div.,* 261 F.Supp. 200 (D.C.Ill.1966), affirmed 394 F.2d 833 (7th Cir.).

Defendants placed great reliance in argument at trial on the *Carvel* case to support their argument that the selling of "unmarked" food items by plaintiffs constitutes an infringement. *Franchised Stores of New York, Inc., v. Winter,* 394 F.2d 664 (2nd Cir.1968). However, that case cannot be argued logically to apply to the facts of this case. There, one of the licensor's primary product was the ice cream topping, which was expressly provided for in the license, and for which the licensee substituted a counterfeit product. Here, in contrast, "Dairy Queen" sells no hamburgers. (Answer of Defendants to interrogatory No. 11(a), referred to Tr., p. 251). Further, the license agreement is silent as to such products. Plaintiffs' hamburgers cannot be counterfeit.

Defendants do sell hamburgers in their "Brazier" franchise. But, plaintiffs have no license, or any other contractual arrangement whatever, with the Brazier operation and refrain from holding themselves out as having such a franchise, and they have avoided permitting the Brazier trademark to be displayed on their premises.

Plaintiffs do not sell any food product distinctively associated with "Dairy Queen," so there can be no confusion with that trademark (other than that created by defendants' television commercials recently). They have not infringed the Brazier trademark because they have not used such mark, and have not sold any distinctive Brazier trademark because they have not used such mark, and have not sold any distinctive Brazier products.

As to the second source of confusion, the evidence in the record is that a significant number among plaintiffs' customer expect hamburgers in plaintiffs' Dairy Queen store, and that such expectations were markedly intensified by the 1979 television commercial campaign discussed above. These plaintiffs did no more than add items to their product line to fulfill the expectations created by defendants, and actually ameliorated the effects of the confusion in those customers' minds. A weak mark may be entitled to protection if it acquires a "secondary meaning," which exists when a

**1098**

party through advertising and massive exposure has established its mark in the minds of consumers as an indication of origin from a particular source. *Exquisite Form Industries, Inc. v. Exquisite Fabrics of London,* 378 F.Supp. 403 (D.C.N.Y.1974). To represent in television commercials that hamburgers come from Dairy Queens can only diminish both marks.

The existing confusion as to what the mark means is not the fault of these plaintiffs, but was inherited, and was aggravated by defendants. In the early years of Dairy Queen, the licensor encouraged the sale of food at the *sole* discretion of the store owners in Fort Wayne as to variety. Then, in the early 1960s when the defendant corporations were founded and decided to go into the food business, they attempted to engraft a trademark on a trademark, with respect to the old stores by contractually imposing the "Brazier" mark on the "Dairy Queen" mark. The "new" stores are prominent Brazier restaurants, which also serve Dairy Queen ice cream. Plaintiffs' store, as several other stores in this market are neither, and their character became established long before the defendant corporation existed and got into the food business. The mere registration of the various marks can give defendants no substantive rights to the exclusion of plaintiffs' established right to sell food in the Dairy Queen store. *Facine v. Starner, supra.*

## IV.

The defendants have combined their claims for trademark infringement and unfair competition in one count. It has been held that under Indiana law, generally speaking, the same set of facts in support of a suit for trademark infringement are applicable to a claim for unfair competition. *G. Leblanc Corp. v. H. & A. Selmer, Inc.,* 310 F.2d 449 (7th Cir.1962). The doctrine of unfair competition is founded upon the common law and is a tort, which is governed by the law of the State wherein the purported cause of action arises. *Oliver Gintel, Inc. v. Koslow's, Inc.,* 355 F.Supp. 236 (D.C.Tex.1973). In this case, Indiana.

Traditionally, the tort of unfair competition was limited to claims that one party had attempted to "pass off" his goods as those of another, to mislead the buying public into purchasing his goods while thinking they were getting those of someone else. *Ideal Toy Corp. v. Kenner Products Div.,* 443 F.Supp. 291 (D.C.N.Y.1977). The tort of "unfair competition" has been recognized under Indiana law as an attempt to create confusion concerning the source of the accused seller's goods. *Westward Coach Mfg. Co. v. Ford Motor Co.,* 388 F.2d 627 (7th Cir.1968); *Hesmer Foods, Inc. v. Campbell Soup Co.,* 346 F.2d 356 (7th Cir. 1965).

In the typical claim for unfair competition, when associated with a trademark infringement claim, the accused competitor is charged with the adoption of a trademark or a package which is deceptively similar to the party seeking the protection. Such is not being charged in this case. As plaintiffs understand it, defendants assert that they have spent a great deal of effort and money in the promotion of the name "Dairy Queen" as a seller of soft ice cream products, and the name "Brazier" as the seller of a food line. While the plaintiffs did not sell *fried* hamburgers and the like until the season of 1980, there was a period of time in the early 1950s when prepackaged hamburgers and cheeseburgers were sold in plaintiffs' store. Defendants' expert admitted that there is no secret ingredient in defendant's hamburgers, and that in its original Brazier concept was broiled, rather than fried. Further the evidence shows that a sloppy joe was sold throughout the life of plaintiffs' store, among other sandwiches. The testimony was that a sloppy joe is hamburger which is served in a sauce on a bun, rather than fried and served on a bun. There is also evidence that plaintiffs' store sold hot dogs and coney dogs long before the Brazier trademark was registered and the first Brazier store was opened in Indiana in 1963.

The evidence is clear that the plaintiffs have made no attempt to appropriate

the name Dairy Queen and attach it to its food line, any more than it was used with the approval and encouragement of defendants' predecessors for the preceding 25 years. Notwithstanding defendants' advertising, they have conceded in their Answer to Interrogatory No. 11 that simple Dairy Queen stores have not been approved for the sale of hamburgers by these defendants. Therefore, there cannot have been any appropriation of the Dairy Queen image as the origin of plaintiffs' hamburgers.

The plaintiffs have always sold their full food line and non-Dairy Queen beverages in plain containers and wrappers. Plaintiffs have refused to use meats and other raw products that come in Brazier packages, using generic products from the same dealer source. There is no display of any Brazier sign on the premises, and there has been no attempt whatever to appropriate any Brazier image. The fact that the defendants have muddled, with respect to the television advertising, the images of "Dairy Queen" and "Brazier" should not work to disadvantage of these plaintiffs, in view of 25 years of sale of sandwiches and other food items in their simple Dairy Queen store.

This memorandum shall constitute the findings and conclusions under Rule 52 FRCP.

On the basis of the foregoing, judgment shall enter in favor of the plaintiffs, Roy P. Terry and Vicki S. Terry, and against International Dairy Queen, Inc., and American Dairy Queen Corporation. Costs assessed against the defendants.

SO ORDERED.