Paper No. 17
GDH/gdh

4/14/98

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
_____

Trademark Trial and Appeal Board
_____

In re Pingel Enterprise, Inc.
_____

Serial No. 74/421,666
_____

Douglas B. White of Douglas B. White & Associates for applicant.

Ronald R. Sussman, Senior Trademark Examining Attorney, Law Office 108 (David E. Shallant, Managing Attorney).
_____

Before Sams, Hohein and Hairston, Administrative Trademark Judges.

Opinion by Hohein, Administrative Trademark Judge:

Pingel Enterprise, Inc. has filed an application to register the configuration reproduced below as a trademark for "land vehicle parts; namely[,] fuel filters and valves".[1]

---

[1] Ser. No. 74/421,666, filed on August 9, 1993, which alleges dates of first use of January 1977.

Applicant states in the application that "[t]he mark consists of a design of a fuel valve for motorcycles"[2] and that "[t]he lining on the drawing [of the mark] indicates surface texture and shading and does not indicate color."[3] Registration of the configuration on the Principal Register is sought on the basis of a claim of acquired distinctiveness pursuant to the provisions of Section 2(f) of the Trademark Act, 15 U.S.C. §1052(f).

Registration has been finally refused under Sections 1, 2 and 45 of the Trademark Act, 15 U.S.C. §§1051, 1052 and 1127, on the ground that the configuration sought to be registered is de jure functional and thus is unregistrable, irrespective of any claim of acquired distinctiveness.[4] Alternatively, on the basis of the same statutory provisions, registration has been finally refused on the ground that, even if applicant's configuration is only de facto, rather than de jure, functional, it has not acquired distinctiveness as an indication of origin for applicant's goods.[5]

---

[2] Applicant, in its brief, states further that "[t]he mark for which registration is sought consists of the image of a high performance motorcycle petcock fuel valve." Such image or design, we note, also incorporates a fuel filter. However, inasmuch as it appears that the type of fuel valve and filter combination at issue herein is known in the trade simply as a petcock, it will be so referred to herein.

[3] In addition, we note that the term "Pingel" and the other matter shown in broken or dotted lines does not form part of applicant's putative mark. See Trademark Rule 2.51(d) and TMEP §1202.03(c).

[4] It is well settled, of course, that "[e]vidence of distinctiveness is of no avail to counter a de jure functionality rejection". In re R.M. Smith, Inc., 734 F.2d 1482, 222 USPQ 1, 3 (Fed. Cir. 1984).

[5] Applicant states in its brief that the "mark is used as a product configuration mark and is also used as a logo on printed materials, packaging, and point of sale displays for both catalog and retail sales of ... Applicant's motorcycle products." However, for purposes

2

Applicant has appealed. Briefs have been filed, but an oral hearing was not requested. We affirm the refusal to register on each ground.

The evidence of record in this appeal, all of which was furnished by applicant, consists of the following:[6]

> (i) The declaration of Wayne Pingel, applicant's president since its inception, which among other things sets forth yearly sales and advertising figures for applicant's petcocks from 1978 to 1994; contains the assertions that:
>
>> "The actual valve of Applicant represented in the subject trademark is machined from extruded aluminum or brass stock. In that manufacturing process any desired external shape or surface ornamentation can be applied, and Applicant's choice of a hexagonal shape was arbitrary and non-functional. Most valves manufactured by competitors use a cheaper die cast process, and while that process of manufacture is less expensive, the variety of external surface shapes available with either process is unlimited";
>
> and is accompanied by exhibits consisting of sample advertising for and magazine articles about applicant's goods, industry catalogs showing alternatively available designs of petcocks, form letters from dealers attesting to their recognition of the appearance of

---

of determining the issues of de jure functionality and acquired distinctiveness, it simply makes no difference in this appeal whether we regard the matter which applicant seeks to register, as shown on the drawing submitted with the application, as either the product configuration of applicant's petcock or a "logo" thereof. Compare In re Universal Filters, Inc., 218 USPQ 456, 459 (TTAB 1983) [design mark, as used on nameplate, is not an accurate depiction of product's configuration and thus could not be de jure functional].

[6] The quoted descriptions of the items listed in subparagraphs (iii) through (vii) are from applicant's February 20, 1996 response to the Office action of September 19, 1995.

applicant's petcock configuration as a trademark, and copies of applicant's two utility patents covering certain features for its goods;

(ii) The affidavit of Alan D. Wilks, Ph.D., and Jeffrey G. Knoll, P.E., of Packer Engineering, Inc., an engineering consulting firm, which attests to a review and accompanying report by such firm with respect to "[a]pplicant's fuel valve as depicted in its trademark application, Serial No. 74/421,666," including an installation video and the "opinion of Packer Engineering, Inc." that:

"1.) The configuration of the subject valve body does not yield a utilitarian advantage over valves having other valve body configurations;

2.) Competitors of PINGEL® do not need to use a hexagonally shaped valve body in order to make an equally competitive product;

3.) Alternative valve body designs are available which provide similar utility as the subject valve; and

4.) The shape of the PINGEL® valve body is not functional in the sense of utility, installation or manufacture";

(iii) A "copy of the installation instructions for a Harley-Davidson reserve metering valve," for which applicant's petcock is marketed as a substitute;

(iv) An "actual Harley-Davidson [reserve metering] valve demonstrating its diverse appearance while providing the identical function";

(v) An "actual Pingle [fuel] valve, the appearance of which is the subject of this [application for] registration";

4

(vi) A "photograph of Applicant's [fuel] valve employing the 'rotary twist knob' ... variation of the valve [which] retained the basic hexagonal appearance ... but differed slightly in the actuation means" in that a rotary twist knob was utilized instead of the lever or control arm shown in the configuration sought to be registered; and

(vii) A copy of applicant's 1995 "catalog [as] referred to in the Packer Engineering report and showing a number of alternative variations of the [fuel] valve design."

Turning first to the issue of whether applicant's petcock configuration is de jure functional, we note that the Supreme Court, in the case of Qualitex Co. v. Jacobsen Products Co. Inc., 514 U.S. 159, 34 USPQ2d 1161, 1163-64 (1995), recently reaffirmed the importance of the functionality doctrine in trademark law by pointing out that:

The functionality doctrine prevents trademark law, which seeks to promote competition by protecting a firm's reputation, from instead inhibiting legitimate competition by allowing a producer to control a useful product feature. It is the province of patent law, not trademark law, to encourage invention by granting inventors a monopoly over new product designs or functions for a limited time, 35 U.S.C. §§154, 173, after which competitors are free to use the innovation. If a product's functional features could be used as trademarks, however, a monopoly over such features could be obtained without regard to whether they qualify as patents and could be extended forever (because trademarks may be renewed in perpetuity). *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 119-120[, 39 USPQ 296, 300] (1938) (Brandeis, J.); *Inwood Laboratories, Inc. [v. Ives Laboratories, Inc.]*, [456 U.S. 844 (1982)] ... at 863[, 214 USPQ 1 at 9] (White, J., concurring in result) ("A functional characteristic is 'an important ingredient in the commercial success of the product,' and, after expiration of a patent, it is no more

5

the property of the originator than the product itself") (citation omitted). Functionality doctrine therefore would require, to take an imaginary example, that even if customers have come to identify the special illumination-enhancing shape of a new patented light bulb with a particular manufacturer, the manufacturer may not use that shape as a trademark, for doing so, after the patent had expired, would impede competition--not by protecting the reputation of the original bulb maker, but by frustrating competitors' legitimate efforts to produce an equivalent illumination-enhancing bulb. See, *e.g.*, *Kellogg Co.*, *supra*, at 119-120 (trademark law cannot be used to extend monopoly over "pillow" shape of shredded wheat biscuit after the patent for that shape had expired). This Court consequently has explained that, "[i]n general terms, a product feature is functional," and cannot serve as a trademark, "if it is essential to the use or purpose of the article or if it affects the cost or quality of the article," that is, if exclusive use of the feature would put competitors at a significant non-reputation-related disadvantage. *Inwood Laboratories, Inc.*, 456 U.S., at 850, n. 10. ....

In line therewith, it has long been settled law that, as stated, for example, in In re Bose Corp., 215 USPQ 1124, 1126 (TTAB 1982), *aff'd*, 772 F.2d 186, 227 USPQ 1 (Fed. Cir. 1985):

A shape or configuration of an article which is in its concept essentially or primarily utilitarian or functional cannot function as a trademark under the Federal trademark statute, and cannot be registered either on the Principal or Supplemental Register. In re Deister Concentrator Co., [Inc., 289 F.2d 496,] 129 USPQ 314 (CCPA 1961); Best Lock Corp. v. Schlage Lock Co., [413 F.2d 1195,] 162 USPQ 552 (CCPA 1969); In re Honeywell, Inc., 187 USPQ 576 (TTAB 1975), *aff'd*, [532 F.2d 180,] 189 USPQ 343 (CCPA 1976); In re Water Gremlin Co., [635 F.2d 841,] 208 USPQ 89 (CCPA 1980); In re Lighting Systems, Inc., 212 USPQ 313 (TTAB 1981); [and] In re Teledyne Industries, Inc., 212 USPQ 299 (TTAB 1981). This rule applies

6

irrespective of whether [an] applicant may have established a de facto secondary meaning in the configuration of its goods due to the existence of a patent claiming the configuration as a patentable feature or extensive advertising and promotion of the configuration over a period of time. In re Water Gremlin Co., supra, at [9]0-91. Accordingly, the threshold issue in this appeal is whether the configuration ... sought to be registered here is or is not dictated primarily by functional or utilitarian considerations.

In determining such an issue, the court in the leading case of In re Morton-Norwich Products, Inc., 671 F.2d 1332, 213 USPQ 9, 15-16 (CCPA 1982), outlined several general factors to be considered when evidence thereof is of record (*emphasis by the court*):

Keeping in mind ... that "functionality" is determined in light of "utility," which is determined in light of "superiority of design," and rests upon the foundation "essential to effective competition," ... there exist a number of factors, both positive and negative, which aid in that determination.

Previous opinions of this court have discussed what evidence is useful to demonstrate that a particular design is "superior". In In re Shenango Ceramics, Inc., 53 CCPA 1268, 1273, 362 F.2d 287, 291, 150 USPQ 115, 119 (1966), the existence of an expired utility patent which disclosed the *utilitarian advantage of the design* sought to be registered as a trademark was *evidence* that it was "functional". .... It may also be significant that the originator of the design touts its utilitarian advantages through advertising. ....

Since the effect upon competition "is really the crux of the matter," it is, of course, significant that there are other alternatives available. ....

It is also significant that a particular design results from a comparatively simple or cheap method of manufacturing the article.
....

Applicant, in its brief, asserts that "[t]he [fuel] valve image which is the subject of this appeal can be [further] described as a composite of features consisting of (1) a hexagonal shaped valve body with (2) an extension neck covered by a filter sleeve, (3) an actuating lever and (4) a protruding valve outlet."  Perhaps because, when installed in a motorcycle gasoline tank and connected to a fuel line, only the hexagonally shaped fuel valve body itself and the actuating lever arm of applicant's petcock are visible, applicant tends to focus its arguments on a claimed lack of functionality of such features. However, while contending in its brief that "[t]he present application does not seek to control or prohibit the use of a bulbous valve housing, an extension neck for a reserve valve [and filter], an actuating lever, nor a fuel outlet," applicant significantly admits that "[c]learly, these features are commonplace for all reserve metering petcock valves," including the one for which the product configuration at issue herein is sought to be registered as a trademark.

Nevertheless, applicant contends in particular that the hexagonal shape of its petcock is not functional since the shape does not provide any advantage during installation of the valve. Applicant points to the instructions for both its petcock and the Harley-Davidson model which it replaces as indicating that such valves "are designed to be hand held during installation."  The

8

fact that two motorcycle magazine articles, which respectively appeared in the August 1995 issue of Hottest Custom Iron and the March 1995 edition of Thunder Alley, instruct readers to install applicant's petcock by utilizing a wrench, with the jaws thereof wrapped with electrical or masking tape to avoid marring the chrome finish of the valve, to hold the valve in place while the final tightening of the adapter nut or fitting is made with another wrench, does not mean that the hexagonal shape of the valve body is functional, applicant contends. Specifically, applicant maintains that merely because "the hexagonal appearance of the valve body invites the use of a taped open-end wrench during installation," in contravention of the instructions provided by applicant, does not mandate a finding that the valve body is shaped just for such a purpose.

Applicant urges, instead, that the proper manner of installing its petcock is set forth in the conclusion of the Packer Engineering report, which is that "the petcock valve should be held by hand while an adapter nut is tightened with a wrench." According to applicant:

> The Packer Engineering report is not only consistent with the manufacturer's instructions and decades of mechanics' experience, but it is also consistent with the varied and diverse competing petcocks on the market ..., all of which are to be installed the same way into a Harley-Davidson fuel tank -- hand held.
>
> The lack of functionality of a hexagonal body is further evidenced by the fact that none of the competing petcocks have adopted a hexagonal body even though Applicant's hexagonal valve body has been in commercial production for nearly two decades and fully

9

available to all competitors.  While the
Examiner argues that the hexagonal body
satisfies a need in the industry, the market
has proved that a hexagonal valve body as an
element of this mark presents no utility as a
product configuration, and even less when
used as a logo. ....

The fact that the look of Applicant's
valve might invite one to unnecessarily apply
an open-end wrench instead of using one's
hand cannot be said to have rendered that
feature "functional" in a trademark context.
In other words, that a look might suggest an
unintended misuse of a feature certainly
cannot mean that a function dictated the
look.  ....

Applicant also contends that, "[i]n addition to the

[fuel] valve body, the actuating lever and the valve outlet in

Applicant's composite mark provide a small contribution to the

appearance of the petcock, and cannot be entirely ignored in the

look of the overall mark."  In minimizing the contribution of

such features to the utility of the design, applicant asserts

that, "[w]hile Applicant's lever and outlet must perform specific

functions, those functions do not dictate their actual external

appearance and positioning, or their contribution to the overall

appearance of the composite mark."

Finally, with respect to the filter element of its

petcock design, applicant similarly diminishes the degree to

which such feature is dictated by its utilitarian function,

insisting that:

The filter covered extension neck of
Applicant's petcock valve is only required to
extend, as do all extensions for all reserve
valves of this type.  But like the neck of
the "Fantastik" spray bottle [in *Morton-
Norwich*, supra at 16], it serves an inherent
purpose while its exterior adds incidentally

10

> to the overall appearance of the composite mark. .... [T]he extension neck for petcock valves can present a non-functional exterior appearance, particularly when an ornamental shape, design or covering is applied to the exterior. Here, the appearance of Applicant's extension neck is decorated by a sleek mesh sleeve with a flattened hat shaped extremity. This sleeve provides a function to the extent that it acts as a filter, but other aspects of its appearance (sleek look with flattened hat) are also ornamental. But most importantly, other exterior appearances for the extension neck are equally as available. Size, shape, contour, sleeve coverage, extremity closure, and surface features are but a few of the design tools available to a competing valve to achieve a differing look. A striking example of an extension neck with a filter sleeve on a competing valve is the one sold by Harley-Davidson, submitted as evidence herein ....

In short, applicant urges that because, in terms of shape, size and/or appearance, none of the principal features which contribute to the overall look of its petcock design is essential to the use of its product or to the use of petcocks generally, such a design is not de jure functional.

The Examining Attorney, on the other hand, maintains that consideration of the evidence of record in light of the *Morton-Norwich* factors establishes a prima facie case of de jure functionality for the configuration which applicant seeks to register and that applicant has failed to rebut such a case.[7] Among other things, the Examining Attorney observes that, contrary to applicant's contention that the hexagonally shaped

---

[7] It is settled that it is incumbent upon the applicant to prove that the configuration or design of its goods is not de jure functional if a prima facie case is established that the configuration or design is functional in law. See, e.g., Textron, Inc. v. U.S. Int'l Trade Comm'n, 753 F.2d 1019, 224 USPQ 625, 629 (Fed. Cir. 1985); In re R.M.

body of its petcock is arbitrary and provides no utilitarian advantage in terms of installation or otherwise, the motorcycle magazine articles plainly contradict applicant's position. As explained by the Examining Attorney (*emphasis in original*):

It must be understood that motorcycle fuel tanks are fitted with threading on the underside which is designed to accept a fuel valve. The casing of [the body of] applicant's fuel valve, like all motorcycle fuel valves, is threaded in order that it may be secured to the underside of a motorcycle fuel tank by means of an adapter nut. In order for the valve to be installed onto the fuel tank, the valve must be *threaded onto the tank*. This requires a turning motion be applied to the valve and/or the adapter nut during installation. As the valve is turned into the tank, the resistance becomes greater as the valve is tightened onto the tank. A particular torque must be employed in order that fuel does not leak out of the tank at the point of installation. This necessitates that some degree of force be applied either to the valve, or the adapter ring, and if the ring, then the valve body must be held in place while this force is applied in order that the valve is positioned properly for ease of use, and in order that the connection to the fuel line (the "orifice") is in the proper position for installation.

The familiar hexagonal shape of today's nuts and bolts is no accident. The hexagonal shape allows that there is always a parallel side to any of the flat surfaces on the nut or bolt. Thus, an open[-]end wrench may be applied to any of the flat surfaces as an aid to turning. A larger number of flat surfaces would result in a smaller surface area for the wrench, resulting in a greater number of stripped nuts and bolts. Fewer flat surfaces would require that the wrench be turned in a greater arc before the wrench may be removed and reapplied to the nut or bolt for turning; a handicap in tight surroundings. Six sides have proven over time to be the optimum

Smith, Inc., <u>supra</u>; and In re Teledyne Industries, Inc., 696 F.2d 968, 217 USPQ 9, 11 (Fed. Cir. 1982).

12

number for this purpose.  Suffice it to say that the hexagonal shape has become the standard shape for the heads of nuts and bolts, as well as any device which requires aid in turning by a wrench, and that wrenches and sockets have been designed to accommodate this shape.

Applicant would have us believe that it is merely an accident of aesthetics that its threaded outer casing is designed in a hexagonal shape which is coincidentally *exactly* the right size to fit a 25 millimeter open[-]end wrench; that the ability to tighten the [fuel] valve onto the tank with a wrench designed for the purpose as opposed to using pliers with rags on the jaws or using only one[']s own hands provides no advantage in installation, and is, in fact, an "unintended misuse" of the product.  ....  What applicant characterizes as "misuse" is in the eyes of others ... a clear and obvious installation advantage.

In view thereof, the Examining Attorney asserts that the motorcycle magazine articles show that the use of two wrenches, taped to avoid scarring the chrome finish of applicant's petcock, provide a simpler and better method of installation than applicant's recommended instructions and which would not be possible if the body of the fuel valve, like the adapter nut or fitting, were not hexagonally shaped to accommodate the shape of an open-end wrench.  Moreover, while applicant's hand-held method of petcock installation may be quite easy when the underside of a motorcycle fuel tank is unobstructed by the heads and cylinders of a large engine, the Examining Attorney also points out that, "[d]epending upon the particular model of motorcycle being worked on, [and] because of engine components in the way, there may not even be enough room to turn the valve [by hand] in a complete circle when threading it onto

13

the tank." Use of a protectively taped open-end wrench, the Examining Attorney notes, would facilitate installation in such circumstances, provided that the valve body of the petcock is hexagonally shaped, like applicant's, to fit the wrench. As to the findings of the Packer Engineering report, the Examining Attorney additionally notes that (*emphasis in original*):

> This report analyses [sic] the package instructions and the valve and indicates that a wrench is not *required* in the installation of the valve and therefore, the shape of the valve body provides no particular advantage during installation. The report does not specifically say that the applicant's method of installation is superior, although it implies as much when discussing the disadvantage of the wrench (scratching the chrome). Actually, the report ... only argues that a wrench is not *required* in the installation of the valve. It does not answer the question as to what is the *best* way to install the valve.

Thus, as to the hexagonal shape of the body of applicant's petcock, the Examining Attorney concludes that "[t]o give the applicant a monopoly via the trademark laws of this important feature would violate public policy, as any manufacturer of fuel valves should be free to employ a hexagonal shaped valve body in order to take advantage of the fact that a wrench on the body makes the valve easier to install, notwithstanding possible alternative but less satisfactory methods of installation."

With respect to the other principal features of applicant's petcock design, namely, the actuating lever, valve outlet and filter element, the Examining Attorney essentially argues that such features are dictated primarily by the functions they are designed to perform. The Examining Attorney concedes

14

that "the 'actuating means,' or lever which is used to open and close the [fuel] valve could be made [by] employing a number of different, yet equally satisfactory designs, although the optimum placement of this handle is somewhat limited."  Nevertheless, like the knurled rotary twist knob variation demonstrated by applicant in the record, the Examining Attorney appears to suggest that an actuating lever or control arm is one of only a few basic, superior designs for controlling the operation of a petcock and thus must be regarded as functional.  As to the valve outlet or orifice, the Examining Attorney contends that its look and placement are dictated by the make and model of the motorcycle with which the petcock is designed to work.  Specifically, the Examining Attorney asserts, and applicant has not denied, that:

> The [valve outlet or] orifice is a particular outside diameter in order that it exactly fit the inside diameter of the motorcycle's fuel line.  The slight bulge at the end is used to keep a fuel line clamp around the fuel line from pulling off, and is a common feature of all such fuel line connectors as shown by the many examples of competitive fuel valves of record.  The placement of the orifice is dictated by the placement of the fuel line of the particular make and model of the motorcycle for which the valve is designed. This is all quite evident based upon common sense as well as a comparison of applicant's valve with the alternative valves submitted as evidence ... in the [installation] videotape, and in the many magazine articles and advertisements of record.  ....

Lastly, as to the filter element, which applicant refers to as having an "extension neck ... decorated by a sleek mesh sleeve with a flattened hat shaped extremity," the Examining

15

Attorney accurately points out that the extension neck is actually a fuel tube and that the sleek mesh sleeve with a flattened hat-shaped extremity serves as a filter screen, with a crimped end, for the valve. According to the Examining Attorney:

> The evidence shows that all fuel valves
> employ this type of fine mesh filter around
> the fuel tube, and all appear to be equally
> sleek. The flattened hat is another way of
> saying that rather than being flattened
> perpendicular to the sides, the end is
> crimped, which would likely be a less
> expensive method of manufacture giving the
> applicant a slight competitive advantage in
> this regard. .... [The extension neck or
> fuel tube] is a particular height so as to
> create a reserve of fuel in the tank [and],
> thus, its height is dictated by the tank it
> is inserted into. ....

While it is clear from the above that applicant and the Examining Attorney are diametrically opposed in their views, we find upon consideration of each of the *Morton-Norwich* factors that the petcock configuration in issue is de jure functional and hence unregistrable. Turning first, in this regard, to a review of the utility patents furnished by applicant, we note that it is well settled that the existence of one or more utility patents which disclose the superior utilitarian advantages of a design generally is adequate, and frequently is conclusive or incontrovertible, evidence of the de jure functionality of a configuration. See, e.g., Best Lock Corp. v. Schlage Lock Co., supra at 556 and In re Shenango Ceramics, Inc., supra. Although neither applicant nor the Examining Attorney has specifically discussed this factor in their briefs, it is apparent that while applicant's utility patents pertain to the internal operation of

16

its reserve metering fuel valve, such operation nevertheless primarily dictates the overall outward appearance or design of the petcock with respect to the location of the actuating lever, fuel line outlet and filter screen extension, in relation to the valve body, and the size or length of the standpipe enclosed by the filter screen extension.

In particular, applicant's U.S. Patent No. 4,957,138, which issued on September 18, 1990, and its U.S. Patent No. 4,250,921, which issued on February 17, 1981, respectively contain the following figures as illustrations of the preferred embodiments of its inventions.[8]

The figure reproduced on the left above is from the '138 patent, which discloses an anti-siphoning device for a reserve metering

---

[8] We note that, unlike a design patent, the figures appearing in a utility patent do not actually define the claimed subject matter; instead, they merely illustrate embodiments of the claimed invention. However, the figures in a utility patent are part of the required disclosure of the invention.

17

valve, and is described as "a perspective view of a reserve

metering fuel valve in accordance with the present invention

having a standpipe protruding upwards therefrom and a filter

screen enveloping the standpipe, and showing the location and

positioning of the anti-siphon sleeve adhered to the inside of

the filter screen."  Significantly, in addition to the objects of

the invention, which are to provide (i) "a device for eliminating

the tendency of the reserve metering valves to siphon the reserve

fuel via the filter screen," (ii) "an uncomplicated and

inexpensive solution to the siphoning problem" and (iii) "a

device for eliminating the siphoning problem which may be easily

retro-fitted to existing valves," the background of the invention

contains the following description of the prior art:

> Reserve metering valves employing a standpipe are generally old in the art and are particularly popular as fuel control valves.  Generally, reserve-metering valves comprise a body member exhibiting multiple orifices and conduits therein.  A valve member is mounted within this body to selectively connect certain conduits to the outgoing orifice.  Typically, one conduit would be connected to the standpipe and arranged to draw fuel therethrough.  A second conduit would be connected to an inlet at a lower point within the tank and arranged to draw fuel therethrough upon selection by the control valve.

The figure depicted on the right above is from the '921

patent, which covers a reserve metering valve, and is described

as "a front elevation pictorial view of the preferred embodiment

of the present invention."  In the background of the invention it

is noted that while "[p]rior valves have attempted to provide

reserve metering capability by providing resetable mechanisms and linkages which detect fluid level and shut off fuel flow," such "prior approaches have generally been bulky, complicated, and generally inapplicable to motorcycle applications where miniature size, simplicity, and extreme reliability are demanded." Besides stating that the objects of the invention are to provide (i) "a valve for a motorcycle fuel line which may be operated quickly and which provides both a reserve metering capability and an absolute fuel shut off" and (ii) "a reliable valve apparatus which involves a minimum of components and is accordingly economical to manufacture," the '921 patent also describes the operation of the invention as follows:

> [T]here is shown a preferred embodiment of the present invention having at it's [sic] lower extremity a lever **12** for operating the valve and at it's [sic] upper extremity it's [sic] normal inlet port **14** covered by a fuel filter screen **16**. Below the normal inlet **14** there is a reserve inlet **18** again located under the fuel filter screen. These inlets provide access to an internal passage ... of the valve section member ... fitted within [the] casing. .... This valve is arranged for mounting within a fuel tank by thread means **17** by gravity feed.

> Selection of inlets is accomplished by a valve selection member rotated by control handle **12** within the casing chamber. This chamber has an outlet port **32** formed in it's [sic] side for coupling to an external fuel line. .... When the fuel level in the tank drops below the normal inlet port **14**, flow would be interrupted until the operator moves control arm **12** to the reserve position ... In this reserve position secondary inlet port **18** in the valve casing becomes aligned with the internal opening ... to the passageway of the valve selection member. Flow will begin again through openings **18** ....

19

The '921 patent also describes "an alternative embodiment of the present invention with a spring biased port selection mechanism" which "is controlled by an attached [knurled] dial". Both the preferred and alternative embodiments are described by the '921 patent as "an improved reserve valve which provides ... an uncomplicated assembly of a reciprocal or rotatable selection member which selects inlets at different elevations to distinguish a low fuel level and provide a reserve meter." The '921 patent additionally confirms that the distance between the inlet ports on the standpipe or filter extension extremity "define[s] a predetermined reserve volume in the fuel tank."

The foregoing not only makes it plain, as previously noted, that the configuration of applicant's petcock has the overall outward appearance or design which it does because such features as the actuating lever, fuel line outlet and filter screen extension, in relation to the valve body, and the size or length of the standpipe enclosed by the filter screen extension, collectively work best when so integrated or combined, but that the configuration, including the anti-siphon sleeve and threaded valve body, is a superior design for a motorcycle petcock. See, e.g., In re Bose Corp., 772 F.2d 866, 227 USPQ 1, 4-6 (Fed. Cir. 1985) [loudspeaker configuration] and In re Bio-Medicus, Inc., 31 USPQ2d 1254, 1258-60 (TTAB 1993) [blood pump configuration]. Allowing applicant trademark rights in its petcock configuration would therefore hinder effective competition in the motorcycle fuel valve market.

With respect to the advertising for applicant's product, we admittedly find nothing which explicitly promotes such utilitarian advantages, as disclosed by applicant's utility patents for its petcock configuration, as the simplicity and reliability of operation of its design. Advertising for applicant's product, as well as the printed packaging therefor, nevertheless tout the speed and ease with which applicant's petcock design can be installed, using phrases such as "Quick, easy installation on your Harley-Davidson" and "Easy To Install In Minutes Without Tank Removal". Moreover, applicant's 1995 catalog generally describes its line of petcocks, including the one with the hexagonal valve body which is at issue herein, as follows (*emphasis added*):

> Along with the original *Hex* valve, a "Designer Line" of Power-Flo™ valves has been added offering a diamond shape and, a round shape with either: smooth, lightning, flame or vertical groove designs. Power-Flo™ fuel valves feature highly polished aluminum or highly polished chrome plated brass finishes with either 1/4" NPT, 3/8" NPT, or H-D metric thread including adapter, [and] standard 5/16" nipples .... Other features include ... a stainless steel *filtering screen* and *an easy turn lever* for the on/off/reserve positions.

Thus, with respect to stressing such advantageous features of its petcock configuration as its speed and ease of installation, filter element and easy turning lever, applicant's advertising and promotional materials provide some evidence that those features are necessary elements of a superior petcock design which others should be permitted to copy, absent patent

21

protection therefor, in order to compete effectively in the motorcycle fuel valve marketplace.

As indicated by the Federal Circuit in In re Bose Corp., supra at 6, where a product feature "is the best, or at least one, of a few superior designs for its *de facto* purpose, it follows that competition is hindered" by recognition of trademark rights therein. The record in this case reveals that, contrary to applicant's contentions, there are at most only a very limited number of alternative designs which are available for motorcycle petcocks and even a lesser number of alternatives which are used by competitors.[9] Applicant itself, as shown by both the photograph of its knurled knob or twist dial model and the designs reproduced below from its 1995 catalog, offers several alternative petcock designs:[10]

---

[9] Of the alternatives demonstrated by applicant, we have not accorded any weight to those designs which lack an integral filter mesh or screen. Plainly, such designs are simply not viable alternatives since, while they will provide for a metered fuel reserve and otherwise act as a fuel valve, the absence of a fuel filter element means that, in order to obtain the same degree of functionality as applicant's petcock, a separate fuel filter would have to be introduced somewhere in the fuel line system. It is intuitively obvious, however, that an integrated combination of fuel valve and filter for installation into a motorcycle fuel tank is less prone to leakage of fuel than a separately connected fuel valve and filter.

[10] From left to right above, such variations are described in applicant's catalog as a "Lightning Strike Design," a "Vertical Groove Design," a "Diamond Design," a "Smooth Round Design" and a "Flamed Design".

The record indicates, however, that such designs are merely minor variations of the basic design disclosed by applicant's utility patents and, inasmuch as one of those patents has yet to expire, none of the designs presently is entirely available to applicant's competitors.  More importantly, none of applicant's alternative designs, with the exception of its spring-based dial actuated model and its diamond patterned version, features a hexagonally shaped valve body.

Clearly, unlike a round shape, a hexagonal shape on the valve body for a petcock offers a significant installation advantage since it makes possible the use, by those inclined to do so, of an open-end wrench or wrenches to position and/or tighten the valve in place.  Utilizing an open-end wrench or two particularly eases the installation of applicant's petcock in instances where turning the valve body or holding it in place by hand would otherwise be difficult due to spacial restraints.  As the Examining Attorney points out in his brief (*emphasis in original*):

> It seems clear that the hexagonal shape of the valve body will tempt many, if not most people[,] to utilize a wrench on the body of the valve during installation. Whether this is "unintended misuse" or simply common sense is irrelevant.  And this is true notwithstanding the report from ... Packer Engineering ..., which shows and discusses a

no doubt quite adequate method of installation.  It is[,] however, probably not the *best* method of installation considering the happy coincidence that a 25 millimeter open[-]end wrench, or an adjustable wrench (with tape on the jaws, of course)[,] will greatly facilitate installation.  This remains true whether it was the intention of applicant when designing the valve or simply a lucky accident.

Furthermore, directly contrary to the sworn statements in both

the Pingel declaration and the Wilks and Knoll affidavit and glaringly at odds with the opinions in the Packer Engineering report, a careful reading of the installation instructions which accompany the packaging for applicant's petcock reveals that, in the case of its "1/4" NPT AND 3/8" NPT" models, the hexagonally shaped or "Hex valve" is to be installed, unlike the round shaped or "Round valve," with the use of a protectively taped wrench (*emphasis added*):[11]

> 4a. *Round valve*: Install the valve into the tank or adapter *by hand* until the nipple is facing the proper direction and the valve feels tight and secure.
>
> 4b. *Hex valve*: Install the valve into the tank or adapter *with an adjustable wrench using masking tape, duct tape, etc. on the jaws to prevent scratches on the valve. Pull the wrench around* until the nipple outlet is facing in the proper direction and the valve feels tight and secure.

There simply is no doubt, therefore, that the hexagonally shaped valve body of applicant's petcock configuration offers a significant advantage in installation, as the motorcycle magazine articles relied upon by the Examining Attorney also make clear.

---

[11] While the statements relied upon by applicant to support the registrability of the configuration at issue may only be inadvertently inconsistent, they would appear at this juncture to be materially false and misleading. However, in fairness, we observe that in the case of its "H-D METRIC & NUT" model, the pertinent installation instructions recommend use of a protectively covered wrench only to tighten the adapter nut after the valve and nut assembly has been threaded into the tank (*emphasis added*):

> 5. To align the hose nipple for proper fuel line positioning, *hold the nut with one hand* and then turn only the valve clockwise as viewed from the bottom of the valve to the desired position. Now securely *tighten the adapter nut with an adjustable wrench using masking tape, duct tape, etc. on the jaws to prevent scratching the surface.*

As to alternative configurations which are actually available to competitors, the record shows that such alternatives are basically reproductions of the stock or standard Harley-Davidson petcock for which applicant's product is a replacement. A representative sample of such designs, many of which also feature a hexagonally shaped valve body and/or adapter nut, is reproduced below:

Applicant, as noted earlier, has admitted, as a comparison of the above designs with applicant's configuration plainly shows, that such features as "a bulbous valve housing, an extension neck for a reserve valve [and filter], an actuating lever, ... [and] a fuel outlet" are "[c]learly ... commonplace for all reserve metering petcock valves". Other than the type of filter element employed, the only readily discernible difference in applicant's

configuration from that shown by competitors' petcock designs is that applicant's actuating lever, due to the manner of operation dictated by the utility patent for its fuel valve, is axially located in relation to the valve housing while the actuating lever in competitive products is mounted on the side of the valve body.  The record reveals, moreover, that a capped tubular screen filter, like the ones shown above, is one of only two alternative designs, with the other being the crimped mesh filter utilized by applicant and which, by the very nature of the use of a fine screen mesh, provides a "sleek" appearance.

It is plain from this record that, contrary to applicant's assertions, there are but two basic designs for motorcycle petcocks:  applicant's configuration and the standard Harley-Davidson design which competitors have been free to copy with minor variations.  Thus, as stated by the Federal Circuit in In re Bose Corp., supra at 6:  "In this respect, this case is unlike *Morton-Norwich* where 'an infinite variety' of container shapes remained available to competitors."  Here, competitors in the petcock replacement market essentially have only the stock Harley-Davidson design to copy.  The design of a motorcycle petcock, including such necessary features as an actuating lever, filter screen and extension neck, simply is not infinitely variable, but is, instead, limited by operational and spacial constraints[12] to the two fundamental approaches shown by this

---

[12] Plainly, a control arm cannot be so long as to risk inadvertent engagement of the reserve or shutoff functions, nor can the filter screen surrounding the extension neck extend beyond the inside height of the fuel tank.

27

record.  Applicant's configuration, like the stock or standard design it replaces, owes its appearance to the fact that the design thereof simply works better.  Moreover, as explained earlier, applicant's configuration is a superior design in terms of the ease of installation provided by its hexagonally shaped valve body.  As such, there is plainly a competitive need, upon expiration of applicant's utility patents, for competitors to copy applicant's design, in order to effectively compete in the marketplace for replacement motorcycle petcocks, since there is an absence of a sufficient or meaningful variety of alternative petcock designs which perform the same functions equally well.

A final factor for consideration is whether applicant's petcock configuration results from a comparatively simple or inexpensive method of manufacturing.  As stated in the utility patents covering applicant's product, both the anti-siphoning device (shown as the dual bands within the upper portion of the filter element of applicant's configuration) and the petcock itself are designed, respectively, to provide "an uncomplicated and inexpensive solution to the siphoning problem" and "a reliable valve apparatus which involves a minimum of components and is accordingly economical to manufacture".  That applicant, despite the inherent advantages of a design which is simple and less expensive to manufacture than other petcocks, has, however, deliberately chosen a more complex and expensive manner in which to manufacture its product does not mean that the configuration thereof is not de jure functional.  Specifically, as stated in

the Pingel affidavit, that applicant has decided to produce its petcock by employing the more involved and costlier process of having it "machined from extruded aluminum or brass stock" rather than utilizing, as is the case with "[m]ost valves manufactured by competitors[,] ... a cheaper die cast process," does not serve to avoid a finding of de jure functionality for its product configuration.  See, e.g., In re Bio-Medicus Inc., supra at 1265.

Nevertheless, in the event that our holding of de jure functionality is ultimately reversed, we turn to the alternative issue of whether applicant has demonstrated that its petcock configuration has acquired distinctiveness as an indication of origin for its product.  Applicant asserts that its petcock design has acquired distinctiveness as a result of continuous use and "extensive advertising ... covering a period exceeding 16 years" during which "the mark was carried on packaging and point of sale displays".  In addition to the sales and advertising figures mentioned in the Pingel declaration,[13] applicant relies

---

[13] Specifically, applicant's president lists the following "gross sales" and "[a]dvertising expenditures" over a 17-year period:

| YEAR | SALES | ADVERTISING |
|------|-------|-------------|
| 1978 | $32,695 | $3,780 |
| 1979 | $41,985 | $3,878 |
| 1980 | $41,889 | $2,496 |
| 1981 | $66,215 | $3,381 |
| 1982 | $55,243 | $4,028 |
| 1983 | $87,111 | $6,421 |
| 1984 | $93,971 | $6,939 |
| 1985 | $132,781 | $16,521 |
| 1986 | $156,657 | $10,442 |
| 1987 | $215,901 | $10,465 |
| 1988 | $299,351 | $20,760 |
| 1989 | $363,575 | $21,000 (approx.) |
| 1990 | $607,669 | $21,000 (approx.) |
| 1991 | $827,130 | $21,150 |
| 1992 | $1,069,981 | $32,968 |

upon form letters from dealers for its motorcycle petcock which attest to their recognition of the appearance of applicant's configuration as a trademark.[14] In particular, applicant insists that:

> [C]orrespondence was submitted from a sampling of 31 consumers familiar with products of this type attesting to the mental association and recognition of Applicant's mark. While Applicant's counsel assisted these consumers in appropriately wording their support for this registration, that fact, as a matter of law, does not make these submissions any less honest or less valid.

We concur with the Examining Attorney, however, that applicant's showing is insufficient to establish acquired distinctiveness. In particular, while applicant is correct that the virtual identity in language found in the dealer letters, due to their having been drafted by applicant's attorney, is not in and of itself fatal to the probative value thereof insofar as a showing of acquired distinctiveness is concerned,[15] their lack of

---

|      |             |           |
|------|-------------|-----------|
| 1993 | $1,456.571  | $35,463   |
| 1994 | $1,811,850  | $43,577   |

[14] By and large, each letter reads in substance as follows:

> We have been engaged for many years in the business of buying and selling products for the motorcycle industry. Of the many products we handle, the hex-shaped fuel valve manufactured by Pingle Enterprise, Inc. has been highly successful and has come to symbolize their product line. Currently, the appearance of this valve is recognized by those of us in the industry as unique to Pingel Enterprise, Inc. and synonymous with the quality and goodwill of that company. We accordingly urge the United States [Patent and] Trademark Office to recognize the significance of the appearance of this valve and to grant a trademark registration on it.

[15] See, e.g., In re Data Packaging Corp., 453 F.2d 1300, 172 USPQ 396, 399 (CCPA 1972) [fact that affidavits were drafted by applicant's attorney and were practically identical in wording "detracts little or

probative value lies, instead, in the fact that they reveal absolutely nothing as to whether the ultimate purchasers of motorcycle petcocks recognize or otherwise regard applicant's petcock configuration as a source indicator. The dealer letters are all limited exclusively to what "those ... in the industry" recognize as being "unique" to applicant. However, as the Examining Attorney, quoting from In re Semel, 189 USPQ 285, 288 (TTAB 1975), persuasively points out: "It is well settled that the assertions of retailers, who know full well from whom they are buying, that they themselves recognize a particular designation [or design] as a trademark ... cannot serve to establish that members of the purchasing public, who come to the marketplace without such specialized knowledge, would in fact recognize the designation [or design] as an indication of origin." See also In re Meyer & Wenthe, Inc., 267 F.2d 945, 122 USPQ 372, 376 (CCPA 1959) [it was incumbent upon applicant to submit proof that its mark is distinctive, not only to experts in the field, but to purchasing public] and In re Pennzoil Products Co., 20 USPQ2d 1753, 1758 (TTAB 1991) [declarations from marketers of automotive oil products lacked persuasiveness as to purchasing public's primary understanding of the term "MULTI-VIS" since, given their long-standing business relationships as customers of applicant, it is not surprising that declarants are aware that product bearing such term originates from applicant].

---

nothing from their sufficiency to make out a prima facie case of trademark recognition"].

With respect to the sales and advertising amounts attested to by applicant's president, we agree with the Examining Attorney that, in the absence of any demonstrated promotion of applicant's petcock configuration as a mark, applicant's use of such design for over 16 years and the general growth in its annual sales figures and advertising expenditures during that period simply do not suffice to establish that the purchasing public for motorcycle fuel valves has come to view applicant's petcock configuration as a trademark. While the sales figures may be said to demonstrate a growing degree of popularity or commercial success for applicant's product, such evidence alone does not demonstrate that the configuration thereof has become distinctive. See, e.g., In re Bongrain International (American) Corp., 894 F.2d 1316, 13 USPQ2d 1727, 1729 (Fed. Cir. 1990) [growth in sales may be indicative of popularity of product itself rather than recognition of a term or design as denoting origin] and WLWC Centers, Inc. v. Winners Corp., 221 USPQ 701, 707 (M.D. Tenn. 1983) [popularity in sales alone cannot establish secondary meaning]. Similarly, while the advertising and promotional expenditures might otherwise be indicative of efforts by applicant to develop distinctiveness for the configuration it seeks to register, such outlays alone are not determinative of the success of those attempts. See, e.g., In re Semel, supra at 287 (TTAB 1975) ["in evaluating the significance of advertising figures ..., it is necessary to consider not only the extent of

advertising but also whether the use of the designation [or design] therein has been of such nature as to create in the minds of the purchasing public an association of the designation [or design] with the user and/or his goods"] and Ralston Purina Co. v. Thomas J. Lipton, Inc., 173 USPQ 820, 824 (S.D.N.Y. 1972) [promotional expenditures indicate efforts to establish secondary meaning, but do not determine the success thereof].

More importantly, in this case there is a complete absence of any advertising or promotional uses of applicant's petcock configuration as a mark. Instead, applicant's catalog and advertisements show, as accurately observed by the Examining Attorney, that the petcock configuration is used solely as an illustration of applicant's product:

> In every instance the valve is merely shown. There is nothing to indicate that this silent testimony has somehow educated consumers to view the configuration as a trademark, rather than merely a picture of the goods. Further, many of the advertisements do not even show the whole valve; many of the "elements " for which applicant claims trademark significance are missing from some of the advertising material.

> In any case, all of the examples of advertising material submitted as evidence are merely pictures of applicant's product. None show the configuration used in the manner of a mark. .... People do not ascribe trademark significance to everything [to which] they are exposed. .... A thing must be used in the manner of a mark before a person will understand that it is supposed to be a mark.

In fact, the sole indications which we have been able to find in which applicant refers to and arguably promotes the design or appearance of its product as a trademark are contained in the statement, appearing in fine print on the back of the packaging for its petcock, that "The appearance of this valve is a trademark of Pingel Enterprise, Inc." and the further statement, which is again buried in the fine print of the installation instructions for the product,[16] that "PINGEL® Fuel Delivery Systems are covered under one or more of the following patents: 4,250,921; 4,957,138 & 330,712; other patents pending and the appearance is a trademark of Pingel Enterprise, Inc."

Accordingly, considering the totality of the evidence presented and assuming that applicant's petcock configuration is only de facto rather than de jure functional, we find that applicant has not met its burden of establishing a prima facie case of acquired distinctiveness. Even as to the so-called logo use of such design, purchasers and prospective consumers would regard the depiction of applicant's petcock configuration as nothing more than a graphical representation of applicant's product. Furthermore, absent any advertising or other uses which promote the asserted trademark significance of applicant's petcock configuration, it is unlikely that purchasers and prospective consumers would even take notice of or appreciate the

---

[16] Such instructions, however, are printed on the inside of the packaging for applicant's product and thus are not visible until after the package is opened.

34

statements on applicant's packaging and installation instructions which claim that the appearance of its product is a trademark for a motorcycle fuel valve and filter. Consequently, in order to overcome the refusal, more evidence than that which has been offered, including, in particular, representative advertisements showing extensive promotion of applicant's petcock configuration as a trademark for its product and customer recognition thereof, would be necessary in order to demonstrate that the configuration which applicant seeks to register has in fact acquired distinctiveness in the marketplace for motorcycle petcocks.

**Decision**: The refusal to register is affirmed on each ground.


J. D. Sams


G. D. Hohein


P. T. Hairston
Administrative Trademark Judges,
Trademark Trial and Appeal Board